SEARS, ROEBUCK AND CO. AND AFFILIATED CORPORATIONS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2165-89.       Filed January 24, 1991.

*Frederic W. Hickman, Patrick A. Heffernan, Michael M. Conway, Michael A. Clark, Richard Bromley, Paul S. Caselton, Bradford L. Ferguson, Burton H. Litwin,* and *Michael R. Schlessinger,* for the petitioner.

*Beth L. Williams, Teri A. Frank, Charles W. Maurer, Jr.,* and *Christopher J. Faiferlick,* for the respondent.

COHEN, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes as follows:

| FYE | Deficiency |
| --- | --- |
| Jan. 31, 1981 | $35,539,844 |
| Dec. 31, 1981 (11 months) | 7,706,252 |
| Dec. 31, 1982 | 9,137,694 |

After concessions, the issues for decision are (1) whether certain payments by Sears, Roebuck and Co. to its wholly owned subsidiary, Allstate Insurance Co., are insurance premiums for tax purposes and (2) whether subsidiaries of Allstate Insurance Co. engaged in the mortgage guaranty insurance business may base estimated unpaid losses, deductible under section 832(c)(4), on defaults in payment by borrowers prior to foreclosure on the mortgaged properties. Alternative issues raised by the parties are not reached because of our disposition of these two issues. All section references are to the Internal Revenue Code as amended and in effect for the years in issue. All Rule references are to this Court's Rules of Practice and Procedure.

The two issues set forth above were sequentially tried and separately briefed by the parties. Certain principles, particularly those argued by petitioner, relate to the overall scheme of insurance company taxation. The first issue, referred to in this opinion as the "insurance premiums issue," has been the subject of numerous prior opinions of this Court and of other courts; in other cases, however, the issue has been described as a "captive" insurance issue. The second issue, referred to as the "mortgage guaranty insurance" issue, has not previously been decided.

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. It is simply not possible to reproduce all of the findings requested by the parties. Similarly, we cannot address in our opinion every argument set out in approximately 1,400 (typewritten) pages of briefs of the parties. Despite the importance of these issues, we believe that they may be distilled to the essence of the differences between the parties and resolved concisely, if not comprehensively.

FINDINGS OF FACT

*Sears and Allstate—General Background*

Sears, Roebuck and Co. (Sears or petitioner) is the parent of an affiliated group of corporations filing consolidated returns for the years in issue. Sears is a publicly held corporation, and its stock is traded on the New York, Midwest, and Pacific Stock Exchanges. During the years in issue, Sears was the world's largest retailer, operating more than 400 warehouses and catalogue distribution centers and 830 retail stores. Sears was exposed to a wide variety of risks, including risk of damage or destruction of its stores, warehouses, vehicles, or other properties; work-related injuries to its employees; and injuries to customers or third parties on Sears' premises or by a Sears product or vehicle.

Allstate Insurance Co. (Allstate), a wholly owned subsidiary of Sears, was incorporated in 1931 under the Illinois Insurance Code as an Illinois insurance corporation. Allstate Enterprises (Enterprises) was also a wholly owned subsidiary of Sears and engaged in the business of providing financial services. By 1945, Allstate was licensed in 40 States, insured more than 1 percent of the passenger automobiles in the United States, and was the 20th largest automobile insurer (measured by premium volume) in the United States.

Sears first purchased insurance from Allstate in 1945. During the years in issue, Allstate insured approximately 10 to 15 percent of Sears' total insurable risks. Allstate earned premiums in excess of $5 billion during 1980, 1981, and 1982 on all of its lines of insurance. The total premiums for policies issued to Sears by Allstate represented approximately 0.25 of 1 percent of the total premiums earned by

Allstate from all insureds on all lines of businesses for the years in issue. In other words, the total premiums for Allstate's policies with unrelated policyholders represented approximately 99.75 percent of Allstate's total premiums earned during the years in issue.

Historically and through the years in issue, Allstate was formed and operated as an insurance company, regulated by State insurance laws, and taxable as an insurance company under the Internal Revenue Code. Policies issued to Sears by Allstate, described in detail below, are comparable in all material respects to policies issued to unrelated insureds. All of the policies issued to Sears by Allstate in issue in this case were properly executed agreements authorized by appropriate officers of each company. Changes in policy terms during the period of the policies were reflected in properly executed endorsements. With respect to the execution, modification, performance, and renewal of all of the policies in issue, Allstate and Sears observed formalities similar to those followed with respect to Allstate insurance policies with third-party customers unrelated by ownership to Allstate or to Sears and its subsidiaries. Allstate was not formed or operated for the purpose of providing self-insurance to Sears.

The property and liability insurance operations of Allstate during the years in issue ranked Allstate second among U.S. property and liability insurers, measured by the volume of premiums, with capital and surplus in excess of $2,371,000,000, assets in excess of $8,054,000,000, more than 39,000 employees, and more than 18,965,000 policyholders. During the years in issue, Allstate serviced its personal lines from its corporate headquarters, as well as from field offices at 2,500 locations, of which 1,270 were located in Sears stores. Allstate's national accounts, involving large commercial accounts, were serviced by the same network of field and regional offices but underwritten solely from its corporate headquarters.

During the years in issue, Allstate had approximately 40,000 employees who may be categorized as follows:

| Category | 1/30/80 | 12/31/82 |
|---|---|---|
| Full-time agents | 10,200 | 11,700 |
| Claims service, underwriting & policy service, investment, management, administrative, and miscellaneous | 29,000 | 29,200 |
| Total | 39,200 | 40,900 |

The A.M. Best Co. (Best) rates the financial condition of property and casualty insurance companies each year. The premiums and loss statistics reviewed by Best, as reflected in the Best insurance reports, included those premiums and losses attributable to the transactions in issue between Sears and Allstate and between Enterprises and Allstate. Best gave Allstate its highest rating, an A+, for the years in issue.

## Casualty/Liability Insurance and Insurance Premiums

Insurance exists as a mechanism for individuals and business firms to deal with the economic consequences of pure risks. Risk is present when the outcome of an event is uncertain or unknown. A pure risk is one in which the event can produce either a loss or a neutral outcome; there is no possibility of profit. Examples of pure risks are exposures to fires, windstorms, motor vehicle accidents, and liability lawsuits. In contrast to pure risks, speculative risks can produce either a profit or a loss. Insurance requires a reduction, not a complete elimination, of the insured's risk. Insureds always have the residual risk of insurance company insolvency.

An insurance premium generally consists of three basic components. One portion of the premium is intended to cover expected losses. The expected loss is the average amount the insurer would expect to pay in claims over an infinite time period. The risk to the insurance company that errors will be made in estimating the expected loss of its insureds is referred to as "parameter risk."

The second component of an insurance premium is the portion intended to cover operating expenses of the risk pool, such as the expense of paying the agent who sells the policy, the policy underwriter, the accountants, and the attorneys who litigate disputed claims.

The third component of an insurance premium is "risk loading." Over the long term, the risk loading component

can be expected to provide profit to the insurer in exchange for its agreement to assume the risk. Risk loading also compensates the insurance company for the risk of inaccuracy in setting the pure premium and expense estimates, investment risk, and other risks faced by the insurance pool.

Insurers generally seek to "pool" risks from varying events causing losses to insureds. Insurance losses in a relative sense become more predictable as the size of the pool of risks grows. As more risk exposures are assumed by the pool, the average losses experienced by the pool become more tightly distributed around the expected loss. The difference between actual losses and expected losses decreases as a percentage of expected loss or in relationship to the resources of the pool. This is referred to as a reduction in "relative risk." The "law of large numbers" recognizes that the expected value of the average loss per policy can be more accurately predicted, assuming independent exposure units, as the size of the insurance pool increases.

Large commercial risks with a sufficient number of exposure units can be individually rated in various degrees. Individual rating of large commercial risks takes several forms, including experience rating and retrospective rating. Experience rating differs from retrospective rating in that the former is prospective, i.e., the policyholder's premium for any given period is determined by its past loss experience, but not by its experience during the policy period.

The premium under a retrospectively rated policy is set using the loss data generated over the year in which the policy is in force. The retrospectively rated insured typically pays a deposit premium at the beginning of the year. At the end of the year, the insured receives a refund if loss experience has been favorable and may have to pay an additional premium if loss experience is unfavorable. There are usually limits on the amount of the additional premium that must be paid.

Retrospective rating is designed partially to adjust after the fact for errors made in the estimation of the pure premium, and partially to reflect the fact that large insureds need insurance protection primarily for large

losses, rather than for small deviations of losses from their expected values. In a retrospective rating plan, risk loading compensates the insurance company for bearing losses greater than the upper limit or maximum of the plan.

## Sears/Allstate Business

Allstate provided Sears with professional underwriting services, claim reserving, claim handling and administration, and computerized claim tracking system capabilities. The total premiums paid by Sears to Allstate and the policies for which those premiums were paid are as follows:

| Type | 1/31/81 | 12/31/81 | 12/31/82 |
|---|---|---|---|
| *Sears* | | | |
| Automobile | $5,709,927 | $3,829,640 | $6,105,150 |
| Garage | 1,650,845 | 1,653,079 | 1,952,229 |
| Workers' | 4,229,601 | 5,413,855 | 3,582,450 |
| Compensation general liability | 1,634,321 | 2,865,152 | 2,017,344 |
| Property | 76,613 | 119,667 | 384,857 |
| *Enterprises* | | | |
| Automobile | 741,224 | 277,830 | 349,318 |
| Total | 14,042,531 | 14,159,223 | 14,391,348 |

The premiums for the policies in issue were determined by experienced underwriters through the application of underwriting processes and procedures similar to those used by the same group of underwriters with respect to policies written by Allstate for insureds unrelated by ownership to Allstate or Sears. The premiums charged Sears were set at an arm's-length rate. Allstate ceded 90 percent of the gross premiums paid by Sears to reinsurers.

For financial accounting purposes, Sears accounted for the premiums paid to Allstate as an expense, in the same fashion as it did for premiums paid to unrelated insurance companies.

During the years in issue, loss events occurred giving rise to losses that were covered under the terms of the Sears and Enterprises policies. Allstate paid the following losses:

| Type | 1/31/81 | 12/31/81 | 12/31/82 |
|---|---|---|---|
| *Sears* | | | |
| Automobile | $3,526,383 | $4,948,101 | $4,842,940 |
| Garage | 991,924 | 993,915 | 1,431,100 |
| Workers' compensation | 4,963,927 | 6,011,408 | 6,630,651 |
| General liability | 207,623 | 2,608,234 | 1,621,400 |
| Property | - - - | - - - | - - - |

| Type | 1/31/81 | 12/31/81 | 12/31/82 |
|---|---|---|---|
| *Enterprises* | | | |
| Automobile | 503,039 | 412,882 | 316,396 |
| Total | 10,192,896 | 14,974,540 | 14,842,487 |

In connection with loss events that occurred during the years in issue, Allstate maintained reserve balances for unpaid losses and unpaid loss adjustment expenses for the Sears and Enterprises policies. The unpaid loss reserve balance as of the end of each year took into account (1) estimated losses on events that had occurred by yearend and were reported by Sears and/or Enterprises by yearend but had not been paid during the year, and (2) estimated losses on events that had occurred by yearend but had not been reported by Sears and/or Enterprises by yearend.

The ratio of net premiums written on all of Allstate's business to its policyholders' surplus for each of the years 1980 through 1982 was as follows:

| Year | Net premiums written | Total surplus as regards policyholders | Net premiums written to policyholders' surplus |
|---|---|---|---|
| 1980 | $5,155,954,689 | $2,371,135,878 | 2.174 |
| 1981 | 5,225,646,895 | 2,395,168,904 | 2.182 |
| 1982 | 5,728,030,913 | 2,822,168,433 | 2.030 |

Policyholders' surplus is the equivalent of the stockholders' equity portion of the annual statement balance sheet. It equals the company's capital accounts plus surplus accounts. Sources of surplus include additions to the company's capital, retained profits or retained earnings, new stock issues, and additional investments by the parent company. Retained earnings increase policyholders' surplus. Policyholders' surplus provides protection against random adverse fluctuation in loss experience (i.e., actual losses occurring in excess of the expected losses) and against underreserving and decreases in asset value.

*Automobile/Garage Liability*

In 1945, Sears entered into a business automobile policy agreement with Allstate. That policy was renewed annually through the years in issue. The named insured in the 1980, 1981, and 1982 automobile policies was "Sears and all subsidiaries and affiliated companies, except Allstate Insur-

ance Company." For purposes of this case, all premiums paid with respect to the 1980, 1981, and 1982 automobile policies may be treated as having been paid by Sears to Allstate. The estimated total premiums stated in the automobile policy declarations were as follows:

| Year | Premium |
| --- | --- |
| 1980 | $6,369,686 |
| 1981 | 5,907,592 |
| 1982 | 6,205,070 |

During the years in issue, Allstate insured between 21,000 and 24,000 automobiles owned or operated by Sears. The automobile policies provided coverage for liability, personal injury protection, property protection, uninsured motorists, and physical damage.

On February 1, 1959, Sears first entered into a garage policy with Allstate that was renewed on an annual basis through the years in issue. The named insured in that policy was "Sears and all subsidiaries and affiliated companies, except Allstate Insurance Company." The estimated total premiums stated in the declarations of the garage policies were as follows:

| Year | Premium |
| --- | --- |
| 1980 | $1,471,738 |
| 1981 | 2,493,211 |
| 1982 | 2,117,932 |

The coverage provided by the garage policies included liability and garage keepers' coverage (coverage for automobiles left with insured for service, repair, storage, or safekeeping).

Pursuant to Endorsement No. 2 of each of the garage policies, the final premium for each policy was to be computed jointly with the corresponding automobile policy, in accordance with the retrospective premium provisions contained in the automobile policy.

Pursuant to Endorsement No. 1 of the 1980, 1981, and 1982 automobile policies, Allstate determined retrospective premiums for both the automobile and garage policies. The loss experience under the automobile and garage policies represents losses incurred or paid and allocated expenses incurred or paid under the Sears policies only, without including experience relating to any other policy. Under the

terms of the 1980, 1981, and 1982 automobile and garage policies, the maximum retrospective premiums payable by Sears to Allstate were $12,428,510, $11,908,076, and $12 million, respectively.

*Workers' Compensation Policy*

Prior to 1957, Sears self-insured in all 50 States against losses relating to injuries suffered by employees during the course of their employment. However, Sears entered into a workers' compensation policy with Allstate for employees in Texas in an effort to comply with the Texas workers' compensation statute. The workers' compensation policy issued by Allstate provided indemnity to Sears for injuries sustained by, or job-related occupational diseases affecting, Sears employees. Through the years in issue, Sears continued to self-insure its workers' compensation risks throughout the rest of the United States.

The final premium under the 1980, 1981, and 1982 workers' compensation plan was computed in accordance with the terms of the policy. Under the terms of the policy, a minimum retrospective premium and maximum retrospective premium were set equal to 45 percent and 110 percent, respectively, of the standard premium.

The retrospective premium for the 1980 policy was the sum of (1) the basic premium for each State, (2) the excess loss premium for each State, and (3) the converted losses for each State, each multiplied by the applicable State tax multiplier.

*Southeast Territory Policy*

Allstate issued a Southeast Territory policy to Sears that provided comprehensive general liability coverage for certain retail store locations in Sears' Southeastern Territory, limited to $10,000 per occurrence. Similar risks were self-insured by Sears in other parts of the United States.

The retrospective premium under the Southeast Territory policies for 1979 and 1980 was the sum of (1) the amount obtained by dividing incurred losses and allocated claims expenses by loss divisors of 0.650 and 0.723, respectively, and (2) attorneys' fees for claims in suit. The retrospective premium under this policy was subject to a minimum and a

maximum equal to not less than 25 percent of the standard premium and not greater than 1000 percent of the standard premium, respectively.

## Allstate Enterprises Automobile Policy

In 1975, Enterprises owned a fleet of approximately 3,000 automobiles. To cover the risk that those automobiles would be damaged or cause damage to third parties or property of third parties, Enterprises entered into an automobile liability policy with Allstate that was renewed on an annual basis from January 1, 1975, through the years in issue. During the years in issue, the policy provided coverage to Enterprises up to a limit of $1 million per loss.

The retrospective premium under the 1980 Enterprises policy was computed by dividing the amount of losses incurred by 0.746. In no event was the retrospective premium to be more than 500 percent of the standard premium. The retrospective premium under the 1981 Enterprises policy was computed by dividing the amount of incurred losses by 0.73. In no event was the retrospective premium to be more than 260 percent of the standard premium. The retrospective premium under the 1982 Enterprises policy was to be computed at the same time intervals and paid in the same manner as the retrospective premium under the 1981 Enterprises policy.

## Property Insurance Policy

Sears' property damage insurance policy was primarily written by Protection Mutual Insurance Co. (Protection Mutual). That policy provided coverage for Sears' potential losses due to fire, windstorm, earthquake, flood, and other natural hazards. The properties protected included all of Sears' warehouses, stores, and other physical locations throughout the United States, including the Sears Tower in Illinois. Protection Mutual negotiated all the terms and conditions of the policy issued to Sears and underwrote two-thirds of the risk. Allstate took the other one-third of the risk but reinsured 90 percent with Lloyds of London.

*Regulatory Framework of Insurance*

Insurance is a highly cyclical business. Significant under-reserving and underpricing exist at the low points of each insurance cycle. Periods of high interest rates are character-ized by intensive competition and "cash flow" underwriting, with the result that premiums may be inadequate to pay losses.

Fully licensed insurance companies, such as Allstate, are heavily regulated by the insurance commissioners of the various States in which they conduct business. State regulators are concerned with financial solvency and market conduct, including matters such as pricing and product content, and with regulation of the claims adjustment process. The primary goal of regulation is to preserve the financial assets and solvency of the company, thereby assuring that the insurer will satisfy loss claims.

State regulators require insurance companies to maintain a ratio of annual premium volume to policyholders' surplus of less than 3 to 1. If the ratio exceeds 3 to 1, the State insurance regulator may place a company under informal supervision and may require the company to slow down its writings or increase its surplus. A ratio in excess of 3 to 1 is generally considered indicia that the company's viability may be in danger.

On insolvency or liquidation of an insurance company, title to the company's assets is transferred to the State liquidator. The parent of a wholly owned insurance subsid-iary has no legal obligation to make additional investments of capital but may instead allow the insurance company to be liquidated. As a practical matter, the parent corporation will provide additional capital in response to the State regulator's request if it does not want the insurance subsidiary to be liquidated.

Illinois law requires the establishment of loss reserves reflecting (1) case reserves—estimated liabilities for insured events that have occurred and are known but are not yet liquidated; (2) losses that are incurred but are not yet known or reported; and (3) reserves for the anticipated or estimated cost of adjusting losses reported and incurred but not reported (IBNR). Regulators may require the company to increase inadequate reserves.

The Illinois Department of Insurance conducted a triennial examination of Allstate's financial condition as of December 31, 1982, and a general review of its practices for 1978 through 1982. The premium to surplus ratios reported by Allstate for 1980 through 1982 were within the "safe" range.

The Sears/Allstate insurance arrangement was accepted as insurance by regulators, reinsurers, State and local governments, commercial enterprises dealing with Sears, and State guaranty funds.

## The PMI Companies—General Background

PMI Mortgage Insurance Co. (PMI Mortgage) was a wholly owned subsidiary of Allstate. PMI Mortgage was organized and incorporated as a stock casualty insurance company under the laws of the State of Arizona in 1972 and in 1973 received a certificate of authority to conduct mortgage guaranty insurance. PMI Insurance Co. (PMI Insurance) during the years in issue was a wholly owned subsidiary of PMI Mortgage. PMI Insurance was incorporated under the laws of the State of California in 1972 and in 1973 received its authority to write mortgage guaranty insurance. Both PMI Mortgage and PMI Insurance (the PMI companies) had their principal offices in San Francisco, California, during the taxable years in issue.

PMI Mortgage and PMI Insurance were insurance companies taxable under section 831. They maintained their books and records in accordance with State insurance regulatory requirements and computed their gross income on the basis of the Underwriting and Investments Exhibit of the Annual Statement approved by the National Association of Insurance Commissioners (NAIC).

During the years in issue, PMI Mortgage only issued policies covering first lien mortgage loans, and PMI Insurance only issued policies covering second lien mortgage loans. Such policies insured mortgage lenders such as banks, savings and loan associations, and other financial institutions.

*Nature of Mortgage Guaranty Insurance*

Mortgage guaranty insurance reduces a lender's risk exposure and enables lenders to make loans to purchasers of residential property. Basically, mortgage guaranty insurance is a substitute for the traditional risk protection that lenders seek from larger downpayments from purchasers and makes housing affordable for many first-time buyers.

After the collapse of the mortgage guaranty insurance industry in the 1930s, the Federal Government began to supply mortgage guaranty insurance through the Federal Housing Administration (FHA) and, later, through the Veterans' Administration (VA). The Federal Government was the principal source of residential mortgage guaranty insurance from 1934 to 1957.

The private mortgage guaranty insurance industry was revived in 1956 with the incorporation in Wisconsin of the Mortgage Guaranty Insurance Corp. (MGIC) as a title insurer. The Wisconsin Insurance Code was amended in 1957 and authorized companies to transact the business of credit insurance, rather than title insurance. The statute was further amended in 1963 to create a new and separate line of insurance, mortgage guaranty insurance. After 1957, following the commercial success of MGIC, a progressive enlargement of the market for private mortgage guaranty insurance developed as an increasing number of States adopted insurance codes that permitted companies to write mortgage guaranty insurance.

Mortgage guaranty insurance continues to be sold to lending institutions by the Federal Government, through the FHA and the VA, and by private mortgage guaranty insurance companies, such as PMI Mortgage and PMI Insurance. The FHA and the VA compete with, and are highly comparable to, private mortgage guaranty insurers.

Mortgage guaranty insurance is a fungible product, with the policy terms and insurance programs being consistent among all private mortgage guaranty insurers. Such standard coverage was required, in part, because lenders sold the mortgage loans in the secondary market to the Federal Home Loan Mortgage Corp. (FHLMC) and the Federal National Mortgage Association (FNMA), which insisted on uniformity in insurance coverage terms.

Standard policies issued by the PMI companies recited that, in consideration of the premiums, the company insured the lender "against loss of the mortgage loan" or agreed to pay "the Loss sustained by reason of the Default by a Borrower on any Residential Mortgage Agreement insured."

Under State insurance regulations applicable to the PMI companies, mortgage guaranty insurance is a "monoline" coverage, which means that companies are restricted to writing only that single line of coverage. Under such regulations, the PMI companies could only insure mortgages on residential property occupied by one to four families. Mortgage guaranty insurance is comprehensively regulated by State insurance departments that regulate the percentage amount of mortgage loans to be insured and the level of the insurance company's policyholders' surplus.

*PMI Mortgage and PMI Insurance Policies and Claims Procedures*

In the case of PMI Mortgage, the coverage generally in effect during the taxable years in issue was limited to the unpaid principal balance due under the mortgage loan agreement, accumulated interest thereon through the date of the tender of conveyance (penalty interest excluded), real estate taxes and hazard insurance premiums advanced by the lender with respect to the mortgaged property, reasonable and necessary expenses incurred by the lender in the preservation of the mortgaged property, and all reasonable and necessary expenses of legal proceedings to vest title to the property in the insured, including court costs and reasonable attorneys' fees (not exceeding 3 percent of such unpaid principal balance and accumulated interest). In the case of PMI Insurance, coverage was generally limited to those same amounts plus any cost incurred by the lender in curing a delinquency on the first mortgage instrument if so directed by PMI Insurance.

Under the terms of the policies of insurance issued by the PMI companies, the insured lender was required to notify the insurer when a borrower under an insured mortgage loan was "in default," i.e., the borrower failed to make a required payment of principal and interest on a timely basis. For PMI Insurance, notice was required when the

borrower was 2 months in default; for PMI Mortgage, notice was required when the borrower was 4 months in default. In practice, some lenders gave notice sooner than the policies required, while other lenders sometimes failed to give notice in the time required. A lender's delinquency in giving notice did not affect whether PMI Mortgage or PMI Insurance would honor the claim, although 30 days of interest would be deducted from such a paid claim as a penalty for the late notification. In each case, such notice was to be furnished by the lender on a form entitled Notice of Delinquency (NOD) and was to be furnished by the lender to PMI Insurance or PMI Mortgage within 10 days after the borrower was 2 months or 4 months in default, respectively. After the NOD was given, the lender was obligated to file monthly reports with the insurance company apprising it of the status of the delinquent account and any subsequent action, such as foreclosure proceedings, taken by the lender.

The policies issued by the PMI companies during the years in issue were noncancelable by the insurer and were either (1) annually renewable policies or (2) single premium policies under which a single premium payment purchased coverage for a term of several years. Annually renewable policies could be renewed at the insured lender's option at fixed renewal rates over the life of the mortgage loan. Annually renewable policies represented the majority of premiums written by the PMI companies.

Under the terms of the policies generally in effect during the taxable years in issue, the PMI companies could elect to settle a claim by one of the following methods: (1) The insurer could pay the lender the full amount of the claim and acquire title to the property. In such a case, subsequent sale proceeds from disposition of the property belonged to the insurer and reduced the amount of the loss suffered. In 1981 and 1982, this procedure was used to settle less than 5 percent of the claims. (2) The policies also provided an "optional settlement percentage" procedure. In lieu of paying the full amount of the claim, the insurer could pay a percentage of the covered loss and the lender would retain title to the property. The optional settlement percentage was stated on the face of the policy and was normally between 20 percent and 25 percent. The PMI companies

used this method in the vast majority of instances to settle claims.

Alternatively, the PMI companies could negotiate a compromise settlement amount with the lender. The net cost to the insurer would be less than the amount under the optional settlement percentage procedure. The lender would retain title to, and the right to sell, the property.

In other cases, referred to as preapproved sales, the PMI companies would sometimes authorize a direct sale of the mortgaged property if it appeared certain that the borrower would not cure a delinquency and a purchaser for the property was located. In such instances, the PMI companies would pay the lender for any loss suffered, up to policy limits, due to insufficient sale proceeds. The lender was not required to foreclose or offer title to the mortgaged property to the insurer as a prerequisite to such payment.

Although the policies generally in effect during the years in issue refer to "four months in default" or "two months in default" as a condition requiring notice to the insurer and empowering the insurer to direct the commencement of appropriate proceedings, the length of default was not a condition to recovery under the policies. The policies specifically provided that the insured lender could accept a voluntary conveyance from the borrower or commence appropriate proceedings, even though the borrower's account was in default for less than the prescribed period. In such a case, the lender would not be precluded from recovering for a loss under the policy.

If the borrower's account was 6 months in default, the insured was required to pursue diligently any legal remedy permissible to acquire title, to furnish the insurer with copies of all notices and pleadings filed, to provide the insurer with a statement of the amount anticipated to be due at least 15 days before any foreclosure sale, and to bid at least that amount at the sale.

As a condition to payment of a loss under the terms of the policies (except where the preapproved sale option was selected), the lender was required to tender to the insurer conveyance of title and furnish satisfactory evidence that the lender's title was good and merchantable and free and clear of all liens and encumbrances. With respect to policies

covering second liens, the presence of prior encumbrances was not prohibited. Any loss due was payable within 60 days after the insured filed a claim for loss.

Neither PMI Mortgage nor PMI Insurance paid a claim until the borrower had been divested of title either by foreclosure, by voluntary conveyance, or by a preapproved sale. Under the terms of the policies, it was the lender's responsibility to effect this transfer of title. The lender was required to commence foreclosure proceedings, and the lender controlled and directed such proceedings. The insurers would not accept a transfer of the mortgage.

As interpreted by the PMI companies, the policies generally in effect during the years in issue provided coverage for losses resulting from delinquencies within the policy period. A claim would be allowed as long as the policy was in effect during the period in which the initial delinquency occurred. The policy did not have to be in effect at the time the NOD was received, foreclosure proceedings were instituted, or title was transferred from the borrower.

A lender could cancel a policy during a delinquency period and receive a premium refund and still be entitled to file a claim for loss as long as the initial delinquency occurred within the policy period. If the delinquency was cured, there was no coverage for any subsequent delinquencies that occurred after the cancellation. It was not uncommon for lenders to allow policies to lapse.

In the early 1970s, the FNMA and the FHLMC commissioned a private consulting firm to study the private mortgage insurance industry. This study was completed in 1975. In analyzing claim patterns, the study determined that most delinquencies that resulted in claims occurred within the first 3 years a policy was in effect. The NOD was given after an average of 3.8 months so that the insurer received such notice approximately 28 months after the policy was issued. This claim pattern was consistent with the claims experience of the PMI companies, where it was estimated that most defaults occurred in the third and fourth years of the loan and that the time from default to payment of a claim was between 5 months and 2 years.

### State Regulation of Mortgage Guaranty Insurance

Under State insurance laws and regulations, the PMI companies are required to establish reserves for unpaid losses on insured mortgage loans. Unpaid losses include components for claims reported and unpaid and for IBNR claims. Under governing State reporting requirements during the taxable years in issue, the PMI companies reported their reserves for unpaid losses, as well as losses paid and other required financial information, on the annual statement form approved for such reporting by the NAIC.

The Underwriting and Investment Exhibit of the NAIC Annual Statement requires the following computation for reporting losses incurred:

(a) To losses paid during the year, add reinsurance assumed, and subtract reinsurance recovered;

(b) To the result so obtained, add net unpaid losses outstanding at the end of the current year, and subtract net unpaid losses outstanding at the end of the preceding years.

Net unpaid losses include additions for estimates of reinsurance payable and subtractions for reinsurance recoverable. For the years in issue, the PMI companies computed their Federal income tax deductions for losses incurred in accordance with the annual statement method.

Several States, including Arizona and California, the States of domicile of PMI Mortgage and PMI Insurance, respectively, have adopted specific rules and regulations applicable to insurers transacting mortgage guaranty insurance business in those States. A mortgage guaranty insurer is subject to the restrictions imposed by the State of its domicile as well as other States in which it transacts business.

In 1982, the PMI companies determined their ending reserves for unpaid losses on the case basis method pursuant to State law. Under that method, the companies determined estimates for reported losses on:

(i) insured loans which have resulted in the conveyance of property which remains unsold;

(ii) insured loans in the process of foreclosure; and

(iii) insured loans in default for 4 or more months.

In addition, also pursuant to State law, the PMI companies estimated the amount of losses that had been incurred but not reported to them by the end of that year.

*Requirements Imposed by FNMA and FHLMC*

In 1970, Congress enacted the Emergency Home Loan Finance Act, which required the federally chartered FNMA and the FHLMC to insure that qualified mortgage insurance protection existed on certain low downpayment home loans purchased by them. FNMA and FHLMC provide a secondary mortgage market by purchasing mortgages from the originating lenders and pooling the mortgages as collateral for securities sold to investors. Rules adopted by FHLMC, as in effect for the taxable years in issue, required an eligible insurer to maintain a loss reserve computed on the case basis method, which includes a provision for IBNR claims. Under this method, mortgage guaranty insurance companies estimated reported losses based on categories similar to those considered in the State reserve method described above. For a private insurer of first mortgage loans to be a viable competitor in the mortgage insurance industry, it must meet the eligibility requirements established by the FHLMC.

*FHA Reporting and Accounting Requirements*

The FHA is subject to the audit supervision of the U.S. General Accounting Office (GAO). To fulfill its audit responsibilities, the GAO in 1988 contracted with an independent certified public accounting firm to conduct an audit of the FHA's statement of financial position for the fiscal year ended September 30, 1987. The briefing report prepared at the conclusion of the audit recommended that the FHA adjust its accounting practices and reporting methods so that they were more in line with practices followed by private mortgage guaranty insurers and with generally accepted accounting principles. Adjustments made as a result of these recommendations reduced the FHA's equity by $1.1 billion.

A GAO audit of the financial position of the FHA for its fiscal year ended September 30, 1988, was concluded in

September 1989. Note 8 to the audited financial statements states:

The claims loss reserve is provided for estimated losses incurred by FHA to pay claims on insured mortgages where defaults * * * have taken place, but where claims have not yet been filed. The reserve is estimated based on historical claim and loss experience data, adjusted for judgments concerning current economic factors. * * *

## The PMI Companies' 1981 and 1982 Loss Reserves

Prior to the year ended December 31, 1982, the PMI companies used a loss ratio procedure to establish their yearend loss reserves. Under this procedure, reserves for losses are based on a percentage of premiums earned. This procedure was used by the PMI companies prior to 1982, because they did not have sufficient actual loss experience to use a detailed case basis reserving procedure.

For the year ended December 31, 1982, the PMI companies began using a detailed case basis procedure for establishing their unpaid loss reserves. The 1982 yearend loss reserves for PMI Mortgage were determined using accepted statistical methods to estimate the amount of losses expected to be paid. Estimates were made on the basis of claims, arising from various categories of delinquent loans, that previously had been paid. That methodology is set out below.

PMI Mortgage's risk exposure, the product of the unpaid insured loan indebtedness and the percentage of coverage, was based on company records, pursuant to State insurance regulations, for three different categories of delinquent loans: (1) Delinquent loans not yet in foreclosure, (2) delinquent loans in foreclosure, and (3) delinquencies where foreclosure had been completed and the lender had title to the real estate. These classifications were generally accepted in the industry.

Reductions were made to the risk exposure amounts for cases where the delinquencies were less than 4 months old, for amounts expected to be recovered by PMI Mortgage through repayment programs, for reinstatements identified by company personnel during telephone surveys, for risks in excess of 25 percent of the loan indebtedness (for which the company had no legal liability), and for claims that had

been paid but were still appearing on the delinquency reports.

The remaining net risk exposure for each category was multiplied by a loss frequency factor that represented the likelihood that claims ultimately would be submitted and paid in each category. These factors were determined by PMI Mortgage from its history of loan reinstatements and claim payments made for a period of approximately 2 years preceding the reserve determination.

The product of the net risk exposure and the frequency factor was the estimated risk exposure that PMI Mortgage expected to go to claim in each category of delinquency. These amounts were then multiplied in each case by a loss severity rate. The severity rate is the estimated ratio of claim payments to the risk amount of the policy and is normally greater than 1, because it reflects the fact that, in addition to the delinquent loan amount, the insurer must reimburse the lender for delinquent interest, taxes, insurance, attorneys' fees, and other costs incurred in the foreclosure process.

Multiplying the severity rate by the estimated risk exposure expected to go to claim produced the dollar amount that the company expected to pay in each category of delinquency. These amounts were totaled for the three categories to determine the aggregate loss reserve, subject to certain adjustments. Further adjustments were made to reduce the estimated total liability by unearned premiums on policies covering delinquent loans expected to go to claim and to increase the liability, which was calculated as of November 30, 1982, to reflect further loss estimates for delinquencies received between that date and December 31, 1982.

The end result of the foregoing adjustments was the estimated loss reserve required, at December 31, 1982, on direct coverage provided by PMI Mortgage. Further additions to the reserve were then made to reflect PMI Mortgage's liability under "mortgage pool" coverage, costs associated with real estate owned by the insurer received in settlement of claims, and an estimate of PMI Mortgage's liability for IBNR losses.

Estimated reserve data for mortgage pool coverage reinsured by PMI Mortgage was provided to PMI Mortgage by the lead insurer under each pool policy, and it was reviewed and modified as considered necessary by PMI Mortgage to reflect its estimates of the likelihood of claim, severity, and IBNR loss amounts applicable to such coverage.

The reserve for IBNR losses reflected estimated losses from delinquencies that had not been reported to PMI Mortgage by the date as of which the reserves were computed due to delays attributable to the lending agency, the mail, or the internal processing of the company. Historical patterns were calculated by PMI Mortgage to determine the dollar amount of unreported delinquent loans. The factors for loss frequency and severity used by PMI Mortgage in the primary reserve analysis were also utilized to estimate the amount of unreported losses.

Essentially the same steps were followed in determining the December 31, 1982, loss reserve computation for PMI Insurance that were followed in determining the 1982 yearend reserve for PMI Mortgage. Different claim frequency and severity factors were determined by PMI Insurance because its loss patterns were somewhat different from PMI Mortgage's loss patterns.

*PMI Companies' Loss Experience*

PMI Mortgage had determined on its annual statement and Federal income tax return that its ending 1981 loss reserve was $8,900,328. PMI Mortgage paid claims (net of reinsurance recoveries) in the amount of $8,374,202 with respect to loans in default at the end of 1981. These loss payment amounts do not include additional payments made by PMI Mortgage for reinsurance assumed and for mortgage pool coverage.

PMI Insurance paid losses with respect to loans in default at December 31, 1981, in an amount in excess of its December 31, 1981, loss reserve.

PMI Mortgage determined its ending 1982 loss reserve to be $12,898,433, based upon loans in default at the end of 1982. PMI Mortgage paid claims (net of reinsurance recover-

ies) in the amount of $22,428,203 with respect to those defaults that resulted in claims.

PMI Insurance determined its ending 1982 loss reserve to be $22,962,401, based upon loans in default at the end of 1982. PMI Insurance paid claims (net of reinsurance recoveries) in the amount of $29,068,125 with respect to those defaults that resulted in claims.

In sum, the amount actually paid by PMI Mortgage as claims for insured losses based upon defaults in existence as of December 31, 1982, exceeded the amount of loss reserves reported on its Federal income tax return for 1982 by more than $9.5 million. The amount actually paid by PMI Insurance as claims for insured losses based upon defaults in existence as of December 31, 1982, exceeded the amount of loss reserves reported on its Federal income tax return for 1982 by more than $6 million.

The PMI companies were examined jointly by the insurance departments of the States of Arizona and California with respect to their operations and financial condition in 1980, 1981, and 1982. The examinations were conducted in accordance with uniform procedures prescribed by the NAIC.

The State examiners found that PMI Mortgage's loss reserve at December 31, 1982, reported in its annual statement was deficient by $5,652,444 and directed PMI Mortgage to increase its loss reserve by that amount. In addition, the State examiners found that PMI Mortgage's loss adjustment expense reserve at December 31, 1982, was deficient by $960,915 and directed an increase in that reserve by that amount.

The report concluded that the balance sheet presented by PMI Insurance in its 1982 annual statement accurately reflected the company's assets and liabilities, including December 31, 1982, loss reserve and loss adjustment expense reserve amounts of $22,692,401 and $3,057,599, respectively.

*Tax Treatment*

On consolidated returns for the years in issue, Allstate reported the premiums paid by Sears and Enterprises as earned premium income. Sears deducted the premiums paid to Allstate as business expenses.

Respondent determined that the transactions between Sears and Allstate and between Enterprises and Allstate did not constitute insurance for Federal income tax purposes. Respondent disallowed deductions claimed by Sears and Enterprises for amounts paid to Allstate designated as insurance premiums, and respondent reduced Allstate's reported premium income.

Respondent disallowed the deductions claimed by Allstate for losses and loss adjustment expenses attributable to paid losses and allowed a deduction to Sears and Enterprises for those same amounts for losses sustained and expenses incurred. Respondent determined that the amounts paid by Allstate as insurance proceeds and loss adjustment expense and the amounts paid by Enterprises designated as insurance premiums were distributions of dividends to Sears. Respondent concluded that the foregoing determination did not result in an increase to taxable income, because the dividend distributions were fully eliminated from the consolidated taxable income of the consolidated return group.

The PMI companies established unpaid loss reserves based on estimates of the amount of losses that they would be required to pay as a result of defaults that had occurred by yearend. The PMI companies included the unpaid loss reserves in computing their deductions for losses incurred.

Respondent determined that the PMI companies did not incur a loss until the insured lender obtained title to the mortgaged property. Respondent disallowed the portion of the deductions claimed by the PMI companies that represented loss reserves established for cases where the insured lender had not acquired title during or prior to the year that the return in issue was filed. Respondent's disallowance of a portion of the deductions resulted in the following adjustments to taxable income:

| TYE | PMI Mortgage | PMI Insurance |
|---|---|---|
| Jan. 31, 1981 | $7,314,195 | $3,480 |
| Dec. 31, 1981 | (1,542,260) | (408,327) |
| Dec. 31, 1982 | (2,175,504) | 12,411,603 |

OPINION

The issues in this case arise out of the distinct nature of insurance and the special scheme of taxation applicable to

insurance companies under the Internal Revenue Code. By way of introduction, we incorporate the reasoning and explanation in the following passages from *Bituminous Casualty Corp. v. Commissioner,* 57 T.C. 58, 77-78 (1971):

The nature of casualty insurance requires accounting rules substantially different from the accounting rules applicable to general commerce.

In commerce generally, expenses come first and income follows. The manufacturer must incur the cost of manufacturing his product before he gets paid for it. The merchant must purchase his inventory before he can resell it.

In the insurance industry, however, the reverse is true. The policyholder pays the insurance company in advance and the insurance company's costs, which are primarily the payment of claims, come afterwards. If the premiums were to be taxed as received and the deductions allowed only as they later became fixed, the result would be to tax very large sums of money as income when in fact those amounts will never really become income because they will have to be paid out to policyholders and other claimants.

4. *"Annual Statement" accounting.*—In the case of insurance companies, special tax accounting rules have been present almost from the beginning. From the inception of the income tax in 1913 until 1921 insurance company income was computed for tax purposes under rules relating to corporations generally. In 1921, however, that system was recognized to be inappropriate and special rules were adopted. There had evolved in the insurance industry prior to 1921 a uniform format for reporting casualty company income. That format had been devised and developed by the insurance commissioners in the various States acting through an association then known as the National Convention of Insurance Commissioners, and now known as the National Association of Insurance Commissioners, or sometimes simply as the NAIC. Thus, when the casualty insurance provisions were adopted in 1921, the statute specifically provided that income would be computed on the basis of "the underwriting and investment exhibit" approved by the National Convention of Insurance Commissioners. The substance of that exhibit, although modified and rearranged in some details, has remained essentially the same from 1921 to the present time.

The Annual Statement method of accounting relies extensively on the use of estimated amounts which would be improper under general tax accounting. Thus, for example, instead of taking into income all of the premiums received or accrued, casualty insurance companies take into account only the portion of those premiums which are estimated to be "earned." Similarly, the major deductions from income are "losses" and "loss adjustment expenses," which are again estimated amounts. The deduction of these loss and loss adjustment expense items is fundamentally at odds with the "all events" test: The items include amounts for liabilities which are not established, but, on the contrary, vigorously contested; they include, in the case of the loss adjustment items,

expenses which will not only be paid in the future, but which are attributable to events which will not even occur until the future, including future overhead; and they are so unsusceptible of accurate estimate that Internal Revenue Service rules applicable in certain contexts provide that estimates will be considered in aggregate amounts rather than individually and will not be disturbed if, over a period of years, they are on the average within 15 percent of the final figure.

*　　*　　*　　*　　*　　*　　*

* * * [Taxpayers] herein do not contend that the Annual Statement method of accounting is controlling in every respect for tax purposes. However, the Internal Revenue Code clearly adopts the basic approach of the Annual Statement method in computing underwriting income and that basic approach, so far as it concerns income from premiums and losses from claims, is inconsistent with tax accrual rules applicable to commerce generally.

The nature of insurance company taxation is relevant to the two main issues in this case in different ways.

The "insurance premiums" issue, referred to in other cases as the "captive insurance" issue, superficially involves the nature of the payments made by Sears to Allstate in relation to the policies in issue. Because Sears and Allstate filed consolidated returns, however, the tax effect of characterization of those payments as insurance premiums or not insurance premiums arises solely out of Allstate's establishment of reserves based, in part, on the amount of those payments. Petitioner argues that respondent's refusal to allow the payments to be characterized as insurance premiums should be rejected, because the scheme of insurance company taxation better matches income and expenses and should be applied here, where abuses found in true "captive insurance" cases do not exist. Respondent denies that insurance company taxation is premised on matching of income and expenses attributable to losses incurred and argues that, in any event, the overall method of insurance company taxation is irrelevant to whether the payments in question are for insurance.

The "mortgage guaranty insurance" issue, by contrast, involves directly interpretation of those sections dealing with insurance companies other than life insurance companies, specifically sections 831 and 832. With respect to both issues, however, the significance of nontax regulation of insurance companies is disputed. Respondent argues that

State regulation of insurance companies is irrelevant to the first issue and that State and Federal statutes and regulations defining reserves for nontax purposes are not determinative with respect to the second issue. Respondent points out that the goals of regulation of insurance companies are different than the principles of taxation. Petitioner argues that our decision on both issues should be consistent with regulatory characterization of insurance and reserves.

There is a certain irony in the respective positions of the parties on the two main issues. On the first issue, respondent asks that we disregard, in addition to the regulatory environment, evidence that Allstate provides insurance to Sears in every sense other than respondent's tax theory. Respondent relies heavily on economic expert testimony about what should be viewed as insurance. On the mortgage guaranty insurance issue, however, petitioner gives short shrift to the policy terms and other practical aspects of the mortgage guaranty business and asks that we accept petitioner's expert's opinion as to when a loss should be regarded as incurred.

Another common element of the dispute between the parties on each issue is the concept of "insurance risks" or "insured events" as contrasted to financial uncertainty or actual loss. With respect to the first issue, respondent's position is that the risk of loss can never be transferred from a parent to a wholly owned subsidiary and that, because insurance is payment for transfer or shifting of risk of loss, there can be no insurance between a parent and a wholly owned subsidiary. On this issue, respondent ignores the distinction between the immediate consequence of an insured event and the ultimate effect of that event on the net worth of the taxpayer. With respect to the second issue, petitioner ignores the distinction between an insured event and the ultimate effect of that event on the net worth of the taxpayer, i.e., an actual loss incurred.

Both sides of this dispute called on various expert witnesses to support their respective positions. All of the witnesses were well qualified, articulate, and apparently sincere in stating their positions from the perspective offered. We do not list or discuss here the qualifications of the experts; our decision is not based on comparing

qualifications, and listing them would unduly lengthen this opinion. Similarly, we do not use titles, such as "Doctor" or "Professor" in this opinion, because we do not wish to imply any greater deference to the academic experts than to the industry experts who testified. Our conclusions are not based on the persuasiveness of the experts but on the relevance of their views to the applicable legal principles. In any event, there are few differences among the experts on objective matters. They differ primarily in their views of how this case should be decided—a matter on which we must exercise our independent judgment. See *Mid-State Fertilizer v. Exchange Nat. Bank,* 877 F.2d 1333, 1340 (7th Cir. 1989); *Marx & Co. v. Diners' Club, Inc.,* 550 F.2d 505, 510 (2d Cir. 1977).

We recognize that insurance company taxation is a specialized area. We are reluctant, however, to conclude that tax issues involving insurance companies cannot be decided without delegating the role of courts and lawyers to expert witnesses. Taxation of insurance companies, as other subjects of the Internal Revenue Code, involves legal principles and administrative feasibility. We are not required to defer to State or industry expertise, but a certain pragmatism is served by seeking consistency with State or industry standards. Our approach to both issues in this case gives due regard to these considerations.

### Insurance Premiums Issue

As previously indicated, the insurance premiums issue in this case is generally stated as whether Sears may deduct as insurance premiums amounts paid to Allstate, a wholly owned subsidiary of Sears. The tax consequences in this case, however, arise out of the establishment of reserves by Allstate based upon the amounts paid by Sears as insurance premiums. Because Sears and Allstate were parties to a consolidated return, and because we must look at the tax consequences to Allstate, the insurance company, this case is distinguishable from prior cases discussing the characterization of such payments by a parent to a subsidiary as insurance.

This case is also distinguishable from other cases in that Allstate cannot be described as a "captive insurance com-

pany" as that term has been used in prior opinions. For example, in *Clougherty Packing Co. v. Commissioner,* 811 F.2d 1297, 1298 n.1 (9th Cir. 1987), affg. 84 T.C. 948 (1985), the Court of Appeals for the Ninth Circuit stated that a captive insurance company is a corporation organized for the purpose of insuring the liabilities of its owner. Petitioner apparently agrees with this definition. Respondent dismisses as pointless labeling an attempt to define "captive." Respondent argues that the issue should be decided on the basis of analysis rather than labels. We agree that labels are not helpful but disagree with respondent as to the appropriate analysis. Petitioner in this case points out, and we agree, that the evidence negates any inference that Allstate was formed or operated for the purpose of providing insurance to Sears. Allstate's provision of insurance policies to Sears has always been a de minimis portion of Allstate's business.

Our analysis of the insurance premiums issue discusses sequentially respondent's position, petitioner's position, the Tax Court's position set out in prior cases, and application of a reformulated Tax Court position to the facts of this case. Initially, however, we describe the case that is the foundation of all of these positions, *Helvering v. Le Gierse,* 312 U.S. 531 (1941).

In *Le Gierse,* a decedent had purchased an annuity contract and a single premium life insurance policy from an insurance company. The policy would not have been issued without the annuity contract, but in all formal respects the applications and the contracts were treated as distinct transactions. Upon the decedent's death, the face value of the policy became payable to Le Gierse, the beneficiary. The estate claimed that the proceeds of the policy were excludable for Federal estate tax purposes as insurance proceeds. The issue before the Court was whether the proceeds were amounts "receivable as insurance" within the meaning of the statutory exclusion. The Supreme Court considered the language and the apparent purpose of the statute and concluded that "in using the term 'insurance' Congress has identified the characteristic that determines what transactions are entitled to the partial exemption." 312 U.S. at 539. The Supreme Court described as "the fair import" of

the statute "that the amounts must be received as the result of a transaction which involved an actual 'insurance risk' at the time the transaction was executed. Historically and commonly insurance involves risk-shifting and risk-distributing." 312 U.S. at 539. The Court continued: "Analysis of the apparent purpose of the partial exemption granted in * * * [the statute] strengthens the assumption that Congress used the word 'insurance' in its commonly accepted sense." 312 U.S. at 540. The Supreme Court then concluded that the two contracts, when considered together, did not create a transfer of the risk of premature death, because:

Here the total consideration was prepaid and exceeded the face value of the "insurance" policy. The excess financed loading and other incidental charges. Any risk that the prepayment would earn less than the amount paid to * * * [Le Gierse] as an annuity was an investment risk similar to the risk assumed by a bank; it was not an insurance risk as explained above. * * * [312 U.S. at 542.]

Factually the Court found that "annuity and insurance are opposites; in this combination the one neutralizes the risk customarily apparent in the other. From the company's viewpoint, insurance looks to longevity, annuity to transiency." 312 U.S. at 541.

The "characteristic" set out in *Le Gierse*, to wit, the shifting and distributing of insurance risks, has become the keynote of positions of the parties and opinions of various courts. Respondent has successfully argued in other cases that, as a result of contractual arrangements or the ownership interest of the "insured" in the "insurer," risk shifting has not occurred. Petitioner argues that this case is different, relying primarily on the view expressed by this Court in *Gulf Oil Corp. v. Commissioner*, 89 T.C. 1010, 1027 (1987), affd. in part, revd. in part, and remanded (without reaching this issue) 914 F.2d 396 (3d Cir. 1990). In *Gulf*, the majority of this Court expressly rejected respondent's approach and indicated that in circumstances such as those presented here, i.e., where the subsidiary sold policies to a large enough proportion of unrelated persons, the arrangement would not be recharacterized as self-insurance.

*Respondent's Position*

Respondent's position is categorically and concisely stated in his opening brief as follows:

A parent corporation can never shift risk to an insurance company which it wholly owns, regardless of the fact that a substantial part of the subsidiary's business consists of the insurance of unrelated third-party risks. The parent company can never shift risk, or obtain true insurance, from its wholly-owned subsidiary because all of the subsidiary's underwriting losses on the business of its affiliates will ultimately impact the common parent company's income statements and balance sheet assets on a dollar-for-dollar basis.

Respondent labels as "irrelevant" all facts and circumstances other than the parent's ownership of the subsidiary. Thus, respondent would require that we ignore the status of the insurance subsidiary as an insurance company for tax purposes; nontax regulation of insurance companies; the amount of insurance written and sold to unrelated policyholders; the business purpose for organization and operation of the subsidiary; and various other technical aspects of insurance, including the difference between "pure risk" and "speculative risk" described in our findings of fact.

The origin of respondent's position is the "economic family" theory expressed in Rev. Rul. 77-316, 1977-2 C.B. 53, although the formulation in this and other recent cases has been in terms of a "balance sheet test." Versions of this theory have been adopted to some extent by courts other than this Court. See *Humana, Inc. v. Commissioner,* 881 F.2d 247 (6th Cir. 1989), affg. in part and revg. in part 88 T.C. 197 (1987); *Clougherty Packing Co. v. Commissioner, supra; Beech Aircraft Corp. v. United States,* 797 F.2d 920 (10th Cir. 1986), affg. an unreported case 54 AFTR 2d 84-6173, 84-2 USTC par. 9803 (D. Kan. 1984); *Carnation Co. v. Commissioner,* 640 F.2d 1010 (9th Cir. 1981), affg. 71 T.C. 400 (1978); *Stearns-Roger Corp. v. United States,* 577 F. Supp. 833 (D. Colo. 1984), affd. 774 F.2d 414 (10th Cir. 1985); *Mobil Oil Corp. v. United States,* 8 Cl. Ct. 555 (1985). The Tax Court, however, as discussed in detail below, has never adopted respondent's theory.

Respondent's approach in this case was announced in Rev. Rul. 88-72, 1988-2 C.B. 31, and Rev. Rul. 89-61, 1989-1 C.B. 75, which apparently were issued in response to the

opinion in *Gulf Oil Corp. v. Commissioner, supra.* The subsequently issued revenue rulings take the position that the acceptance of insurance risks from unrelated parties is "immaterial" to whether the risk shifting necessary to insurance exists.

Respondent's theory has been supported in this case and in *Humana, Inc., Clougherty Packing Co., Beech Aircraft Corp., Stearns-Roger Corp.,* and *Mobil Oil Corp.* by the expert testimony of Irving H. Plotkin (Plotkin), vice president of Arthur D. Little, Inc. (see also *AMERCO & Subsidiaries, and Republic Western Insurance Co. v. Commissioner,* 96 T.C. 18 (1991), and *The Harper Group & Includible Subsidiaries v. Commissioner,* 96 T.C. 45 (1991), filed this date.) Plotkin bases his testimony on theories of "the firm" and "total financial uncertainty." The essence of Plotkin's position is summarized in the following passage from his written report:

So long as the firm does not transfer to an unrelated entity the ultimate responsibility for the financial consequences of its pure risk, it remains the risk bearer and faces the uncertainty of each year's actual financial losses. The attempted placing of a firm's pure risk, directly or indirectly, in its insurance affiliate does not accomplish a transfer of risk, nor does it constitute an insurance transaction as a matter of insurance theory or practice or as a matter of economic reality. Such arrangements should not be characterized as insurance transactions. When a firm's captive insures unrelated business, the firm has not transferred away its own pure or business risk, it has not reduced its total financial risk; rather, the firm has increased its business and total risk. * * *

Plotkin asserts that Allstate's payments of losses on claims made under the policies issued to Sears have a direct "dollar-for-dollar" impact on Sears' net worth, net income, and earnings.

Respondent also relies on the testimony of Alfred Hofflander, Professor of Finance and Insurance, Graduate School of Management, University of California, Los Angeles, who testified, with mathematical demonstrations supporting his testimony, that the addition of unrelated risks to policies written by an insurance subsidiary for its parent:

(a) Causes the insurance subsidiary's total risk to increase;

(b) Causes the insurance subsidiary's relative risk per policyholder to decrease;

(c) Causes the insurance company's risk per unit of capital to increase;

(d) Causes the insurance company's risk of ruin to increase; and

(e) Causes the insurance company's premium to surplus ratio to increase.

Finally, respondent presented the expert testimony of James E. Wheeler (Wheeler), Professor of. Accounting, Graduate School of Business, University of Michigan, on financial accounting. According to Wheeler, generally accepted accounting principles do not permit an expense for insurance for financial accounting reporting purposes when a parent corporation pays an insurance premium to a wholly owned subsidiary, regardless of whether the insurance subsidiary also insures unrelated parties.

*Petitioner's Position*

Petitioner primarily relies on "common sense"—noting the "commonly accepted sense" language in *Helvering v. Le Gierse,* 312 U.S. at 540. Petitioner argues, however, that:

While * * * the entire line of "captive" cases purports to follow from *Le Gierse,* in reality the *ratio decidendi* expressed in the "captive cases" represents a questionable extrapolation from the facts and opinion in *Le Gierse.*

       *     *     *     *     *     *     *

The courts that extended *Le Gierse* to the captive cases were actively engaged in making new law, not applying old law. *Le Gierse* in no sense required the results produced by the "captive cases". And the court in *Le Gierse* was very clear that it was dealing with practical matters, not technical economic theories of the kind advanced by respondent in the captive cases.

Although petitioner's argument may have merit, we are not prepared here to scuttle the analysis of an entire line of cases.

Petitioner then criticizes respondent's theory as being on a collision course with *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943), which held that separate incorporation will cause entities to be treated as separate and transactions between them to be recognized. Adoption

of respondent's economic theory would have the effect of denying insurance treatment to a transaction solely on the ground that there is a parent-subsidiary relationship between the contracting parties. Petitioner analyzes prior "captive" cases and summarizes its position as follows:

> The case at hand is different from any of the "captive insurance" cases decided to date. The reason can be summarized succinctly: Allstate is a recognized insurance company, not a "captive insurer." Allstate was created to produce insurance products for the public, not to serve the risk management needs of Sears. Allstate has thousands of employees who provide insurance services for millions of policyholders. Allstate is subject to the stringent government regulations of a fully licensed insurance company. It is a financial intermediary, pooling the risk exposures and premiums of Sears together with millions of other insureds.

> \* \* \* \* \* \* \*

> The critical distinction between policies issued by recognized insurance companies and policies issued by "captives" can be preserved under an approach that treats the following requirements as sufficient for "insurance" treatment with respect to policies issued by a subsidiary to a parent:
> (1) There is a transfer of pure risk in form. In other words, legal liability with respect to specific exposures of the parent is transferred to the insurance subsidiary under an insurance policy whose form is in accord with the customs and practices in the insurance industry for the relevant line of insurance.
> (2) The transfer has a substantive effect different from self-insurance,
> (a) The insuring subsidiary is subject to the network of rules regulating insurance companies.
> (b) The exposures and premiums of multiple insureds are pooled within the insuring subsidiary.
> (c) The insuring subsidiary is engaged in the business of insurance and performs an operating function normally performed by insurance companies, including the provision of such services as risk assessment and claims management.

In support of its position, petitioner presented experts from various fields. Joseph E. Stiglitz, Professor of Economics, Stanford University, reviewed the general economic functions of insurance and, based on his analysis, concluded that the arrangements between Sears and Allstate should be viewed as pure insurance. J. David Cummins and Neil A. Doherty, Professors of Insurance, The Wharton School, University of Pennsylvania, discussed the difference between pure risk and speculative risk, the function of pooling

in reducing pure risk, and the advantage of pooling with unrelated third parties. Bruce W. Foudree, a partner in the law firm of Keck, Mahin & Cate, and Spencer L. Kimball, Professor of Law Emeritus, University of Chicago, testified about the extent and nature of State regulation of insurance companies and concluded that the transactions between Sears and Allstate should be treated the same as other insurance contracts. Robert Clements, Chairman of Marsh & McLennan, Inc., testified that Allstate's underwriting of Sears' risks constituted insurance as generally understood by the insurance community. Petitioner's experts did not disagree with respondent's assertion that the addition of insurance written for unrelated insurers increased total risk, but they emphasized the increase in predictability of loss from pure risk and the consequent reduction of financial uncertainty through pooling.

## The Tax Court's Position

Our decision in this case is appealable to the Court of Appeals for the Seventh Circuit, which has not spoken on the precise issues before us. Thus we apply the law as we, as a national court, see it. See *Golsen v. Commissioner*, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971); *Lawrence v. Commissioner*, 27 T.C. 713 (1957).

Although framed in terms of the "risk shifting" and "risk distribution" terminology of *Helvering v. Le Gierse*, 312 U.S. 531 (1941), the Tax Court's position has been to consider all of the facts and circumstances to determine whether a transaction nominally labeled "insurance" should be recharacterized as "self-insurance" or as some other arrangement negating the transfer of risk. At the same time, however, we have consistently rejected respondent's "economic family" theory.

In the first of our cases, *Carnation Co. v. Commissioner*, 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981), the taxpayer-corporation insured its risks with an unrelated company, which, in turn, reinsured 90 percent of those risks with the taxpayer's wholly owned subsidiary. Before agreeing to the arrangement, the unrelated insurer required the taxpayer to increase the subsidiary's capital to $3 million, if necessary, for the subsidiary to meet its reinsurance obliga-

tions. We determined that the arrangement was not insurance and that premiums paid to the third-party insurer that were ceded to the subsidiary were not deductible. The Court of Appeals for the Ninth Circuit affirmed our decision, agreeing that, as in *Le Gierse,* the agreements effectively neutralized risk.

The holding of *Carnation* is an extension of the general rule that reserves set aside to cover a future contingency are not currently deductible, although the losses for which the reserves are created are deductible when actually paid. See *Anesthesia Service Medical Group v. Commissioner,* 85 T.C. 1031, 1045-1046 (1985), affd. 825 F.2d 241 (9th Cir. 1987). Thus our cases have denied deductions for "insurance premiums" in situations where the effect of an arrangement was the establishment of a self-insurance reserve. As indicated in the above quotation from *Bituminous Casualty Corp. v. Commissioner,* 57 T.C. 58, 77-78 (1971), an exception to the general rule exists only for the insurer taxable as an insurance company and not for the insured.

Neither the result nor the rationale of our opinion in *Carnation* has been questioned by the subsequent opinions of this Court. In *Clougherty Packing Co. v. Commissioner,* 84 T.C. 948 (1985), affd. 811 F.2d 1297 (9th Cir. 1987), the views of the members of this Court diverged, however, agreeing only that respondent's theory was not acceptable. The majority opinion concluded with the following statements:

> There are numerous situations in the tax law, both statutory and case law, where the separate nature of the entity is not disregarded but the transaction, as cast between the related parties, is reclassified to represent something else, e.g., reasonable compensation or dividend, loans or contributions to capital, loans or dividends, deposits or payments, or other recharacterization such as permitted under section 482, Internal Revenue Code of 1954, as amended. We have done nothing more in *Carnation* and here but to reclassify, as nondeductible, portions of the payments which the taxpayers deducted as insurance premiums but which were received by the taxpayer's captive insurance subsidiaries.
>
> The only insurance business which * * * [the subsidiary] had was that of petitioner. We expressly decline to decide in this case how the result might be affected, if at all, if the captive insurance company had insurance business from unrelated customers.
>
> [84 T.C. at 960.]

Concurring opinions were more explicit in their reasons for rejecting respondent's theory, and a dissenting opinion expressly concluded that the majority decision conflicted with *Moline Properties, Inc. v. Commissioner, supra.* The Court of Appeals for the Ninth Circuit, in affirming our decision, was divided 2 to 1 along similar lines.

Further differences among members of this Court appeared in the opinions in *Humana, Inc. v. Commissioner,* 88 T.C. 197 (1987), affd. in part and revd. in part 881 F.2d 247 (6th Cir. 1989), with dissenters suggesting that premiums passing between brother-sister corporations should be deductible as insurance even though such payments from a parent to a subsidiary were not. The majority refused to distinguish the situations and reclassified the payments as nondeductible additions to a reserve for losses. The Court of Appeals for the Sixth Circuit affirmed as to the parent-subsidiary issue and reversed as to the brother-sister issue, essentially on the basis of respondent's "balance sheet" approach.

Before the opinion of the Court of Appeals for the Sixth Circuit in *Humana, Inc.* was filed, the tensions between views of members of this Court reached their peak in *Gulf Oil Corp. v. Commissioner,* 89 T.C. 1010 (1987), affd. in part, revd. in part, and remanded 914 F.2d 396 (3d Cir. 1990). None of the members of this Court disagreed with the conclusion that payments by Gulf to its subsidiary were not deductible as insurance premiums. In dictum, however, the majority reiterated its rejection of respondent's theory but noted that, in prior cases, we had specifically reserved any discussion of the tax consequences of payments to "captives" with unrelated owners and/or unrelated insureds. In *Gulf,* a de minimis portion of the subsidiary's premium income during the years in issue was received from unrelated insureds. Commenting on the significance of this fact, the majority stated:

If all of the insureds are related, the insurance is merely self-insurance because the group's premium pool is used only to cover the group's losses. By adding unrelated insureds, the pool, from which losses are paid, no longer is made up of only the affiliated group's premiums. When a sufficient proportion of premiums paid by unrelated parties is added, the premiums of the affiliated group will no longer cover anticipated losses of all of the insureds; the members of the affiliated group must

necessarily anticipate relying on the premiums of the unrelated insureds in the event that they are "the unfortunate few" and suffer more than their proportionate share of the anticipated losses.

Thus, when the aggregate premiums paid by the captive's affiliated group is insufficient in a substantial amount to pay the aggregate anticipated losses of the entire group, the affiliates and unrelated entities, the premiums paid by the affiliated group should be deductible as insurance premiums and should no longer be characterized as payments to a reserve from which to pay losses. Risk distribution and risk transfer would be present, and the arrangement is no longer in substance equated with self-insurance.

[89 T.C. at 1026-1027; fn. refs. omitted.]

The concurring opinion argued that the theory of the majority was in conflict with prior case law and with the expert testimony in *Gulf.* The Court of Appeals for the Third Circuit affirmed our decision on this issue, stating that:

We need not reach the issue which divided the judges of the Tax Court—whether the addition of related insurance premiums into the insurance pool for the tax year 1975 establishes risk transfer and justifies the deduction of insurance premiums paid by the unrelated party to the insurance pool. It is clear to us that, because of the guarantee to the primary insurers, Gulf and Insco did not truly transfer the risk, nor was there a de facto risk distribution to third parties, elements crucial to the allowance of a premium deduction. [*Gulf Oil Corp. v. Commissioner,* 914 F.2d at 412.]

The expert testimony in this case specifically addressed the theory of the majority in *Gulf,* but none of the experts fully adopted or supported that theory.

Our role in this case and in those other cases filed this date, *AMERCO & Subsidiaries, and Republic Western Insurance Co. v. Commissioner, supra,* and *The Harper Group & Includible Subsidiaries v. Commissioner, supra,* is not to dissect or reconsider our prior opinions. Our approach here is to state a formulation or framework and apply it to the facts of this case. Those facts include the predominance of unrelated insureds contributing to the premium income of Allstate and the undisputed classification of Allstate as an insurance company from the standpoint of the industry, State regulators, policyholders, the general public, Subchapter L of the Internal Revenue Code, and all perspectives other than the specific issue raised by respondent in this case. Consensus must necessarily build on the

published views of members of this Court in prior cases. On that analysis, we have identified the controlling factors set out below.

## 1. *The Presence of Insurance Risk*

It is indisputable in this case that under the policies in issue, Allstate agreed to service and pay claims arising out of injuries to persons on Sears' premises or by Sears' vehicles. Certainly these claims relate to "insurance risks" in the commonly accepted sense of the term. We are not here dealing with an arrangement intended to change the tax consequences of "investment risk" as that concept was distinguished from "insurance risk" by the Supreme Court in *Helvering v. Le Gierse*, 312 U.S. 531 (1941). We believe that respondent confuses the concepts of "insurance risk" and "investment risk" when he argues that the characterization of the transactions, the deductibility of the premiums, and the establishment of reserves should be controlled by whether or not Sears' "total financial uncertainty" has been significantly altered by the arrangements between Sears and Allstate. Our focus is on the nature of the losses covered by the policies and the designated responsibility for payment of those losses. Inurement of the ultimate profits or losses from Allstate's operations to the benefit or detriment of Sears is not significant to the analysis of whether the contractual arrangements deal with insurance risks.

## 2. *Risk Shifting and Risk Distributing*

### A. *Risk Shifting*

In form, the policies in issue accomplished technical risk shifting between Sears and Allstate. Insurance contracts were written, premiums transferred, and losses paid. Allstate was a separate, viable entity, financially capable of meeting its obligations. Risk shifting was also present in substance in that Allstate was neither formed nor operated for the purpose of providing "self-insurance" to Sears but sold policies to Sears on the same general terms, in the same market context, and for the same reasons that Allstate sold insurance policies to unrelated third parties. Similarly, Sears purchased insurance policies from Allstate

for the same reasons that third parties purchased insurance policies from Allstate.

Allstate was indisputably formed for a business purpose and functioned as a business apart from its parent's business. Under *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 438-439 (1943), and innumerable cases involving other intracorporate transactions, the separateness of the two entities must be respected absent some reason for disregarding that separateness. No such reason is present here. Compare *Clougherty Packing Co. v. Commissioner,* 84 T.C. at 960, *supra* p. 97.

### B. *Risk Distributing*

Risk distributing is spreading the risk of loss among the participants in an insurance program. *Barnes v. United States,* 801 F.2d 984, 985 (7th Cir. 1986); see *Commissioner v. Treganowan,* 183 F.2d 288, 291 (2d Cir. 1950). Such spreading is effectuated by pooling among unrelated insureds. Pooling accomplishes the purpose of insurance in reducing financial uncertainty.

As set forth in our findings of fact, *supra* pp. 66-67, pooling increases the predictability of loss and thus increases reliability in establishing premiums and estimating appropriate reserves. Although premiums on commercial policies such as those in issue here, particularly retrospectively rated policies, are designed to cover all losses of an insured, the potential still exists that an extraordinary or unpredicted loss will be paid from the common fund.

In view of the breadth and scope of Allstate's insurance business, risk distribution through pooling is indisputably present in this case.

### 3. *Commonly Accepted Notions of Insurance*

Petitioner has established through its expert testimony, and respondent does not seriously dispute, that the arrangements between Sears and Allstate are characterized as insurance for essentially all nontax purposes. A special rule for tax purposes is not justified by either statute or case law.

Our decision in this case is consistent with and gives effect to principles of Federal income taxation. We have

considered separateness of the corporate entities, the form and the substance of the transactions, and the relationship between the taxpayers. In this case, none of those principles leads us to recharacterize the arrangements between Sears and Allstate as anything other than insurance.

For all of the foregoing reasons, we conclude that the payments in issue by Sears to Allstate for insurance policies constitute insurance premiums for tax purposes, including deductibility to Sears and inclusion in Allstate's premium income for establishment of reserves against unpaid losses.

## *Mortgage Guaranty Insurance Issue*

The second issue is whether the PMI companies are entitled to deduct, for Federal income tax purposes, amounts reported as reserves for "losses incurred" on the underwriting and investment exhibit of the annual statement approved by the NAIC. We must decide whether a mortgage guaranty insurer incurs a loss for Federal income tax purposes when a borrower is in "default" and the insurer has been notified of the default or when the lender takes title to the mortgaged property.

Section 831 imposes a tax on the "taxable income" of certain insurance companies. Section 832(a) defines taxable income as "gross income as defined in subsection (b)(1) less the deductions allowed by subsection (c)." Subsection (b)(1)(A) states that gross income includes underwriting and investment income "computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners." Subsection (c)(4) allows a deduction in computing taxable income for losses incurred. "Losses incurred" is defined in subsection (b)(5) as follows:

SEC. 832(b). DEFINITIONS.—

\* \* \* \* \* \* \*

(5) LOSSES INCURRED.—The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

(A) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable

year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year.

(B) To the result so obtained, add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year.

The annual statement requires computations for losses incurred that are in form the same as those under section 832(b)(5).

Petitioner is also required under State insurance laws and regulations to establish reserves for unpaid losses on insured mortgage loans, which include components for claims reported and unpaid, and for IBNR claims. See, e.g., Ariz. Rev. Stat. Ann. sec. 20-1555 (1990); Cal. Ins. Code sec. 12640.16(c) (West 1988).

For 1982, the PMI companies computed and reported their ending unpaid loss reserves in accordance with the case basis method described in our findings of fact. Respondent does not agree that section 832(b)(5) incorporates the annual statement method of computing losses or that the determination of when a loss should be recognized for annual statement purposes is correct for Federal income tax purposes. Respondent contends that the unpaid losses portion of losses incurred should not be included in this computation until title to the mortgaged property has passed to the lender.

## Petitioner's Position

Petitioner contends that for Federal income tax purposes a loss is "incurred," and unpaid loss reserves may be established, at the time that a borrower's loan is in default. Petitioner's position is summarized in its opening brief as follows:

In the case of a mortgage guaranty insurance company, the "insured event" is the borrower's default in payment on the insured mortgage loan. Default is the loss event recognized by the mortgage insurance industry, state regulatory requirements, the courts, the Federal Home Loan Mortgage Corporation, and the Federal Housing Administration. The record is absolutely clear that in the actual conduct of their businesses—in their processing and settling of claims—the PMI Companies recognized default as the insured event. PMI Companies reimbursed policyholders for all losses ultimately sustained with respect to loans on which default occurred during the term of the policy, regardless of

whether the term expired prior to foreclosure or tender of title or prior to the time it was clear that any payment would be required. But PMI Companies did *not* reimburse policyholders for any loss sustained with respect to any loan if the default did not occur within the terms of the policy. [Emphasis in original.]

In support of its position, petitioner presented the testimony of various witnesses.

Walter E. Campion, vice president of the delinquency and claims department for the PMI companies, testified that the PMI companies viewed the event that they insured against as default in payment by the borrower on the mortgage loan. He further testified that, if default occurred before the policy term expired, the companies would honor the claim, even if foreclosure had not been completed and the lender did not take title until after the policy terminated.

Petitioner also offered the report and testimony of Roger F. Blood (Blood), a consultant specializing in the mortgage guaranty insurance industry. Blood's position is summarized in his report:

In my opinion, the *"event of loss"* in mortgage guaranty insurance occurs when the borrower breaches his and/or her contract, i.e., fails to make a monthly payment when due or within any allowable grace period. This event, commonly referred to as a "delinquency," is in fact a contractual default. As with a myriad of other adverse events—insured or otherwise—a whole series of subsequent actions must be undertaken to fix definitively the *amount* of insured loss. [Emphasis in original.]

Petitioner also presented the testimony of Charles K. Schindler (Schindler), the director of Allstate's claims reserves division for 14 years, who testified that it is common in other lines of insurance for a default not to result in a claim being paid. Schindler stated that, depending on the particular line of coverage, anywhere from 10 percent to 90 percent of the cases in which the insured event has occurred ultimately will be closed without payment.

Finally, petitioner presented the report and testimony of Thomas J. Craren (Craren), the engagement partner of the public accounting firm that audited the FHA in 1987 and 1988. Craren testified that, as a result of these audits, it was recommended that the FHA's accounting practices be brought into line with generally accepted accounting principles. He also testified that generally accepted accounting

principles require loss reserves to be recorded on the date of borrower default and that this practice is consistent with the method used by private mortgage guaranty insurers.

*Respondent's Position*

Respondent contends that unpaid losses are merely "estimates of potential losses" and have not been "incurred" for Federal income tax purposes until the insured lender has acquired title to the mortgaged property. Respondent relies in part on section 1.832-4(a)(5), Income Tax Regs., which provides:

(5) In computing "losses incurred" the determination of unpaid losses at the close of each year must represent actual unpaid losses as nearly as it is possible to ascertain them.

The regulations, at section 1.832-4(b), Income Tax Regs., further provide that the taxpayer must establish, to the satisfaction of the District Director, that:

the part of the deduction for "losses incurred" which represents unpaid losses at the close of the taxable year comprises only actual unpaid losses stated in amounts which, based upon the facts in each case and the company's experience with similar cases, can be said to represent a fair and reasonable estimate of the amount the company will be required to pay. Amounts * * * which, in the opinion of the district director are in excess of the actual liability determined as provided in the preceding sentence will be disallowed as a deduction. * * *

In attempting to distinguish between "actual unpaid losses" and "estimates of potential losses," respondent relies on the three cases discussed below.

*Case Law Analogies*

The first case is *Modern Home Life Ins. Co. v. Commissioner*, 54 T.C. 935 (1970). In that case, the taxpayer was obligated to make mortgage payments to the creditor on behalf of the insured mortgagor. The event that fixed the taxpayer's liability was the disability of the insured. The amount that the taxpayer deducted for losses incurred included amounts due and owing from an insured who had filed claims prior to the yearend, plus the estimated liability for payments that would become due and owing in the

"next year from those claimants who were still sick or disabled on December 31 of the prior year." 54 T.C. at 937.

In determining the meaning and effect of the regulations at section 1.832-4(a)(5) and (b), Income Tax Regs., we stated that:

the terms "losses incurred" and "unpaid losses" must be construed to include the estimated liability for losses which could not otherwise be accrued as a deduction in the year in which the insurable event occurred. * * * [54 T.C. at 939.]

Based on the insurance policy at issue, we concluded that the event insured against was the sickness or disability of the insured, at which point "the petitioner's liability to pay 'something' became fixed," and that:

The amount which the petitioner would be called upon to pay was dependent on the duration of that illness or disability but that condition went to a determination of the amount of the liability, if any, rather than to the fact of liability. [54 T.C. at 940.]

Respondent also relies on *State of Maryland Deposit Ins. v. Commissioner*, 88 T.C. 1050 (1987), and *Maryland Savings-Share Ins. Corp. v. United States*, 226 Ct. Cl. 487, 644 F.2d 16 (1981) (the "Maryland cases"). Both cases addressed the deductibility of IBNR losses by the taxpayer, referred to as Maryland Savings-Share Insurance Corp. (MMSIC). The taxpayer was a State corporation that insured the accounts of depositors in member savings and loan associations. The insurer's liability to make payments was triggered by an "event of default" as defined in the taxpayer's bylaws. Those bylaws provided:

"Section 2-703. *Events of Default.* No payment shall be made by the Corporation with respect to its insurance liability, except as otherwise provided, unless an event of default shall have occurred with respect to any member, as defined by these By-Laws, * * *. As used in these By-Laws, and in the Rules and Regulations of the Corporation, the term "event of default" shall mean for any member (A) its adjudication in bankruptcy in accordance with any applicable law of the United States of America, (B) the appointment of a conservator for its affairs by a court of competent jurisdiction in accordance with the laws of this state or any other state in which such member is domiciled, or (C) the appointment of a receiver for its affairs by a court of competent jurisdiction in accordance with the laws of this state or any other state in which such member is domiciled." [88 T.C. at 1055.]

In the first of the Maryland cases, the Court of Claims stated that it is "clear that an incurred but not reported loss refers to a present loss and not one that is merely likely to occur in the future." 226 Ct. Cl. at 499-500, 644 F.2d at 24. Based on the testimony, the court held for the Government because the taxpayer failed to carry "its burden of proof that it incurred any insurance liability in 1971 for events occurring in that year." 226 Ct. Cl. at 503, 644 F.2d at 25.

The Court of Claims relied on testimony that "losses incurred" is commonly defined as "losses for which the insurance company has become liable during the policy period by virtue of the policy definition." 226 Ct. Cl. at 501, 644 F.2d at 24. The taxpayer's first witness testified that the failure of a financial institution, the insured, is due to a certain course of conduct that typically precedes a failure and "may be deemed the incurred loss, and the determination by the insurer of its actual loss may be deemed the reported loss." 226 Ct. Cl. at 503, 644 F.2d at 26. The court determined that under the terms of the taxpayer's bylaws, the taxpayer had not incurred liability "unless such occurrence leads to an event of default" during the year that a loss was claimed. 226 Ct. Cl. at 507, 644 F.2d at 28. The court also rejected the opinion of the taxpayer's second expert witness because he "was only measuring the risks that it *might* incur losses over the next 10 years," not estimating the amount of reserves for losses that had already been incurred in that year. 226 Ct. Cl. at 507, 644 F.2d at 28 (emphasis in original).

The second case involving the Maryland insurer was decided by this Court. The issue to be decided was similar to the issue in the Court of Claims case, and the taxpayer tried to distinguish that decision. One of its theories was that its IBNR loss reserves for 1982 and prior years should not be disallowed because two of its member associations experienced events of default in 1985, and one of the members had experienced liquidity problems in 1979. The taxpayer argued that the losses it paid in 1985 were incurred in earlier years because the acts and events giving rise to the "event of default" occurred over many years.

We held for respondent because the evidence did not establish that any of the losses had been *incurred* by the end of the year in issue. The taxpayer's proposed calculation of IBNR losses was "not based on any loss experience data of MMSIC, but on the loss exposure of MMSIC vis-à-vis its future potential losses," 88 T.C. at 1060-1061, and we concluded that the calculation of IBNR losses "must be based on the actual loss experience of the particular taxpayer." 88 T.C. at 1062.

Our holding in the second of the Maryland cases was also based on the taxpayer's attempt to fix liability to events that did not constitute "events of default" under the taxpayer's bylaws. In rejecting the taxpayer's argument that losses had been incurred, we stated that:

Petitioner is perhaps correct in arguing that in all probability many of the acts and events giving rise to the defaults occurred over many years. Acts such as mismanagement, issuance of bad loans, and embezzlement, however, do not constitute events of default under MSSIC's bylaws, nor do they necessarily result in actual insurance-related losses for MSSIC. * * * Such acts (assuming they occurred at some of the savings and loan associations that were members of MSSIC during the years in issue) would not support loss deductions with respect thereto by MSSIC unless and until they constituted an event of default under MSSIC's bylaws, until they resulted in an insurance-related payment by MSSIC, or until they gave rise to an obligation to make such a payment. * * *
  [88 T.C. at 1061.]

The three cases discussed above, although distinguishable from each other and from the present case, express a recurring theme. In *Modern Home Life Ins. Co.,* we allowed a deduction for the "unpaid losses" portion of "losses incurred" where the event insured against, the disability of the insured, had occurred prior to the end of the year, even though the amount of the loss was not fixed at that time. In both of the Maryland cases, the event insured against had not occurred and, in *State of Maryland Deposit Ins.,* we concluded that the insurance company taxpayer was not entitled to deduct a loss until the occurrence of the event that fixed the liability under the insurer's bylaws. In all three cases, however, the conclusion turned on whether or not the event insured against, under the terms of the policies or contracts at issue, had occurred. In both *Modern Home Life Ins. Co.* and *State of Maryland Deposit Ins.,* we

concluded that an insurer is not entitled to a deduction for unpaid losses until the time that the insurer's liability was fixed under the relevant contractual terms.

*Loss Under the PMI Insurance Policies*

Section 832(b)(5) specifically provides that "The term 'losses incurred' means losses incurred during the taxable year on insurance contracts." Therefore, we must examine the terms of the insurance policies issued by the PMI companies to determine the loss insured against.

The policies generally in effect for the years in issue provided that any loss due to the insured was payable within 60 days after the insured filed a claim for loss, which had to be accompanied by a tender of conveyance of good and merchantable title to the mortgaged property. It was the responsibility of the insured lender to initiate all proceedings and take all action necessary to acquire title. The only time that the insured lender was not required to at least tender title to the insurer was under the "pre-approved sale" method. This was a claims procedure policy adopted by the PMI companies and was not specifically provided in the policies. If a compromise was not reached, the insured was ultimately required to tender title and file a claim for loss. In any event, neither PMI Mortgage nor PMI Insurance paid a claim until the borrower had been divested of title, either by foreclosure, by voluntary conveyance, or by a preapproved sale.

The policies did not require the insurer either to take over the monthly payments of a delinquent borrower or otherwise to make a payment to the lender if a borrower missed one or more mortgage payments. In sum, under the terms of the policies generally in effect during the years in issue, the PMI companies were obligated to pay the insured lender only upon transfer of title from the borrower. Even after a default, the insurer might not and probably would not ever pay anything. Because of this and for the reasons set forth below, we conclude that the PMI companies did not *incur* a loss for Federal income tax purposes until the insured lender acquired title to the mortgaged property.

Petitioner, as set out above, presented expert testimony to establish that the event insured against within the

mortgage guaranty insurance industry is the default of the borrower. From this, petitioner argues that, because a mortgage guaranty insurer is required to establish loss reserves under State regulations considering the default of the buyer, a loss has been "incurred" and is deductible for Federal income tax purposes at that point. A claim was payable if the policy was in effect during the period in which the initial delinquency, or default, occurred. This result merely reflects the coverage of the policy *if* a claim for loss is actually submitted; an insurer does not incur a loss until the initial default has caused the insured lender to acquire title to the mortgaged property.

Petitioner also argues that, because it is required to establish reserves for "unpaid losses" based on the case basis method under State law, the amounts computed under that method should be accepted for Federal income tax purposes. The objectives of State regulation, however, are not identical to the objectives of Federal income taxation. State insurance regulators are concerned with the solvency of the insurer. *McCoach v. Insurance Company of North America*, 244 U.S. 585, 589 (1917). Petitioner's expert, Blood, testified that "The primary concern of the [insurance] regulator is really on behalf of the policyholder that an insurance company will be solvent, and able to pay its claims." In contrast, Federal tax statutes are concerned with the determination of taxable income on an annual basis. *Burnet v. Sanford & Brooks Co.*, 282 U.S. 359, 365 (1931).

The case basis method estimates the number of claims in each of three categories of delinquencies, set forth in our findings of fact, that ultimately will be submitted for claim of loss. Only the final category, delinquencies where foreclosure has been completed and the lender has title to the property, represents "actual unpaid losses" within the meaning of section 1.832-4(b), Income Tax Regs. The regulations permit an estimate of the *amount* that the insurer will be required to pay, not an estimate of "potential losses that might be incurred in future years." *State of Maryland Deposit Ins. v. Commissioner*, 88 T.C. 1050, 1060 (1987).

The case basis method is used to compute the likelihood of loss, i.e., the likelihood that a claim will be submitted. Petitioner's expert witness, Blood, acknowledged this purpose:

Notwithstanding the term "case basis," the true and necessary process under examination here is a *statistical* one. The state MI [mortgage insurance] regulations rationally define several distinct *classes* of defaults against which to reserve for one good reason: The probability of claims payment for each default class is distinctly different. *That some significant and specific amount of loss has occurred* (i.e. *will* eventually be paid) *on each of the designated default classifications is both indisputable and central to this case.* The mortgage insurers' job is to analyze and assign, by means of the loss reserve account, the proper amount of loss which has occurred—via the collective events of many defaults—for each of the designated default classifications. [Emphasis in original.]

Blood's testimony on cross-examination confirms the notion that this method is merely a process for predicting future losses, not computing losses that have actually been incurred:

Q Now, * * * [in your report], you talk about how "grouping defaults by status helped predict the probability of claim; i.e., claims frequency." And how do you define the phrase "claims frequency?"
A As I am using it here, it is a ratio or percentage, and it would be, claims frequency would be defined as the percentage of a group of reported or outstanding defaults that would ultimately become a paid claim. That would be the numerator. The denominator would be the sum of all reported, or outstanding, defaults in a class, that would either, A, become a paid claim or cure — in other words, the denominator would be the sum total of all resolutions, both favorable and unfavorable, and the numerator would be the total of unfavorable resolutions.
Q So this is a prospective projection, as opposed to a computation after the fact.
A Well, yes. As you see, I am using the word "predict" here. That is what I mean by — prospective. Based upon experience, retrospective.

This method relied on by petitioner to determine its "unpaid losses" produces a computation similar to the one rejected in *Maryland Savings-Share Ins. Corp. v. United States*, 226 Ct. Cl. 487, 644 F.2d 16 (1981), and by this Court in *State of Maryland Deposit Ins. v. Commissioner*, 88 T.C. 1050 (1987). In both cases, the taxpayer's deductions were disallowed because the taxpayer attempted to base unpaid losses on "bad events" that did not fix its liability under its bylaws, which are comparable to the

insurance policies at issue in this case. We rejected the taxpayer's inclusion of such acts in its computations and concluded that the events would not support a loss deduction unless and until they fixed the taxpayer's liability under the terms of its bylaws.

Similarly, in this case, petitioner has based its calculations on "bad events," a borrower's delinquency, even though not all delinquencies ultimately result in a payment by the insurer. Petitioner concedes that:

> Only a portion of the *insured events* that occur result in ultimate loss payments. That is true in mortgage guaranty insurance and it is true in other lines of insurance, as well, where the percentage of insured events that does not result in ultimate loss payments can run from 5% to 90%, depending on the nature of the coverage. * * * [Emphasis added.]

Petitioner argues that in the instant case the borrower's default is analogous to the "event of default" in the Maryland cases, thereby enabling it to establish "unpaid losses" based on default. We have concluded for the reasons stated above that the borrower's default in this case is not the event that fixes the liability of the insurer.

Petitioner also argues that the terms "losses incurred" and "unpaid losses" are terms of art that have "specialized meaning" under the annual statement method of accounting. Petitioner acknowledges:

> The interpretation for which respondent argues would be appropriate if we were dealing with deductions for "losses" in the case of taxpayers other than insurance companies. But we are not. The same words often carry very different meanings in different contexts. As used in insurance regulation and taxation, the words "loss," "unpaid loss," and "incurred loss" are terms of art. They have a meaning that is clear (though specialized, like any term of art) and that implements an underlying purpose to match premium revenues with the expenditures (i.e., losses) which those premiums are required to fund.
>
> At the level of the individual policyholder, the term "loss" probably does have, in the layman's mind, the meaning which respondent gives to it. Insurance policies typically reimburse policyholders for "losses" and the *timing* and the *measure* of the insurer's reimbursement to the policyholder depend on a showing that the "loss" has "materialized" or been "realized" by the policyholder.
>
>      *     *     *     *     *     *     *
>
> In short, the incurred "loss" of an insurance company and the "loss" deductible by a non-insurance taxpayer are two different things —

related, but different. Ultimately, the concepts converge, but their timing is entirely different.

Petitioner contends that "the rule for loss recognition pressed by respondent in this case would—in effect—place PMI Companies on a non-insurance tax accounting test for accruing losses," the 'all events'" test. The "all events" test allows a taxpayer to deduct a loss when all events have occurred that establish the fact of liability of the taxpayer and the amount of the liability can be determined with reasonable accuracy. *United States v. General Dynamics Corp.*, 481 U.S. 239, 243 (1987); sec. 1.446-1(c)(1)(ii), Income Tax Regs.

Our conclusion that petitioner has not incurred a loss until after foreclosure does not disregard the special rules applicable to insurance companies. Even if the lender has acquired title, the amount of the loss will not necessarily be known. With respect to IBNR losses, reserves may be established for cases where the lender has acquired title but has not filed a claim for a loss, i.e., the claim has not yet been reported to the insurer. Petitioner, therefore, is not prohibited from using estimated amounts that would be improper under general tax accounting in computing its "losses incurred."

Finally, petitioner argues that the effect on the insured lender is not relevant to determining when the insurer has suffered a loss. Specifically, petitioner states:

The insurer's deduction for losses incurred is not dependent upon when the insured—a non-insurance company—could recognize that a loss has occurred. Acceptance of such a premise would scuttle the 69-year-old special scheme of taxation applicable to insurance companies under the Code.

The reality of the transaction, however, does not support petitioner's contention. "In common understanding, an insurance contract is an agreement to protect the insured (or a third-party beneficiary) against a direct or indirect economic loss arising from a defined contingency." *Allied Fidelity Corp. v. Commissioner*, 66 T.C. 1068, 1074 (1976), affd. 572 F.2d 1190 (7th Cir. 1978). The defined contingency

in this case was the insured's loss on the mortgage loan. It follows that the insurer cannot incur a loss until the insured has suffered the defined economic loss, to wit, after the lender takes title to the mortgaged property.

For all of the foregoing reasons, we conclude that the PMI companies did not incur a loss under section 832(b)(5) until the insured lender acquired title to the mortgaged property.

To reflect the foregoing and the parties' agreement with respect to other issues,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

KÖRNER, SHIELDS, HAMBLEN, SWIFT, GERBER, WRIGHT, PARR, COLVIN, and HALPERN, *JJ.*, agree with the majority.

WELLS and RUWE, *JJ.*, did not participate in the consideration of this opinion.

---

NIMS, *C.J.*, concurring in part and dissenting in part: I agree with the majority on the insurance premiums issue for the reasons stated in the majority opinion, but I respectfully dissent on the mortgage guarantee insurance issue, and agree with Judge Whalen's dissenting opinion on this issue.

JACOBS, *J.*, agrees with this opinion.

---

Chabot, *J.*, concurring in part and dissenting in part: I agree with the majority on the mortgage guarantee insurance issue for reasons stated in the majority opinion, but I respectfully dissent on the insurance premiums issue, and agree with Judge Whalen's dissenting opinion on this issue.

PARKER, *J.*, agrees with this opinion.

---

WHALEN, *J.*, dissenting: I believe that the majority has incorrectly decided both of the issues in this case. First, the majority's treatment of "unpaid losses," a component of the "losses incurred" of a property and casualty insurance company, as defined by section 832(b)(5), is a radical

departure from the annual statement method of accounting, which section 832 and its predecessors have required property and casualty insurance companies to use in reporting underwriting and investment income for Federal income tax purposes since 1921.

Second, in my view, the holding that the payments made by Sears to its wholly owned subsidiary, Allstate, constitute "insurance premiums" disregards the requirement that a transaction must involve risk shifting in order to constitute "insurance." The same is true for the two other so-called "captive" insurance cases released today, *AMERCO & Subsidiaries v. Commissioner*, 96 T.C. 18 (1991), and *Harper Group & Subsidiaries v. Commissioner*, 96 T.C. 45 (1991). I address both issues in turn below.

*Unpaid Loss Reserves of Mortgage Guaranty Insurance Subsidiaries*

I disagree with the majority's holding that a mortgage guaranty insurance company cannot take a delinquent loan into account in estimating "unpaid losses," until the time the lender acquires title to the mortgaged property. I also disagree with the underlying premise that the liability of a property and casualty insurance company does not become fixed, and the insurance company does not realize a "loss," until an event takes place which makes it certain that a payment will be made in a particular case.

At the outset, I note the majority's finding that the PMI companies maintained their books and records in accordance with the State insurance regulatory requirements applicable to mortgage guaranty insurance companies and computed their gross income on the basis of the Underwriting and Investment Exhibit of the Annual Statement approved by the National Association of Insurance Commissioners (NAIC), referred to herein as the annual statement. Majority op. at 73. I further note the finding that, for Federal income tax purposes, the PMI companies also computed their underwriting income, including their deduction for losses incurred, in accordance with the annual statement method of accounting. Majority op. at 79.

For both State regulatory and Federal income tax purposes, the PMI companies computed unpaid losses, in

accordance with the annual statement, by taking into account not only loans under which a borrower's default had resulted in conveyance of the property to the lender but also loans which had been in default for 4 or more months and loans which were in the process of foreclosure. The majority opinion makes the following finding:

> In 1982, the PMI companies determined their ending reserves for unpaid losses on the case basis method pursuant to State law. Under that method, the companies determined estimates for reported losses on:
> (i) insured loans which have resulted in the conveyance of property which remains unsold;
> (ii) insured loans in the process of foreclosure; and
> (iii) insured loans in default for 4 or more months.

> In addition, also pursuant to State law, the PMI companies estimated the amount of losses that had been incurred but not reported to them by the end of that year. [Majority op. at 79-80.]

The effect of the majority's holding is to limit the PMI companies and, presumably, all mortgage guaranty insurance companies to the first of the above three categories of loans in estimating unpaid losses for Federal income tax purposes.

As the basis for this holding, the majority advances the general proposition that an insurance company's liability must have become fixed during the taxable year before the company will be deemed to have incurred a loss for purposes of section 832(b)(5). Short of that time, the majority says, an "insured event" has not taken place during the taxable year and the insurance company is merely estimating "potential losses," rather than "actual unpaid losses," contrary to section 1.832-4(a)(5) and (a)(5) and (b), (b), Income Tax Regs.

I agree with the general proposition advanced by the majority but I disagree with the manner in which the majority applies it in this case. Specifically, I disagree with the majority about what "fixes" an insurance company's liability for purposes of estimating unpaid losses.

The majority adopts the view that an insurance company's liability does not become fixed in a particular case until the occurrence of an event which makes it certain that the company will be required to make a payment in the case. Based upon that view, the majority redefines the

"insured event" under a mortgage guaranty insurance policy in terms of the lender's acquisition of "good and merchantable title to the mortgaged property." The majority reasons that it is not until then that "the PMI companies were obligated to pay the insured lender." Majority op. at 109. The majority also reasons that a borrower's initial default, the insured event used for annual statement purposes, cannot be the "insured event" because, at that point, the insurance company will not necessarily be required to pay a claim. For example, the majority opinion states, "Even after a default, the insurer might not and probably would not ever *pay* anything," majority op. at 109 (emphasis supplied), and the opinion notes, "The policies did not require the insurer either to take over the monthly payments of a delinquent borrower or otherwise to make a payment to the lender if a borrower missed one or more mortgage payments." Majority op. at 109.

After thus redefining the "insured event" under a mortgage guaranty policy, the remainder of the opinion is merely an application of the general proposition to which I referred above. The majority merely declares that any estimate of "loss" made on the basis of an event which takes place prior to the insured event, i.e., the lender's acquisition of title, is improper because it involves only an estimate of potential losses, rather than actual losses. Since the majority defines "insured event" in terms which make payment in a particular case a certainty, the effect of the majority opinion is to substantially delay the time at which the PMI companies, and presumably all mortgage guaranty insurance companies, are permitted to recognize losses for tax purposes.

My principal objection to the majority opinion is that it summarily disregards the different timing rules under the annual statement. Moreover, in my view, there is no authority for the majority's premise that payment must be certain before a "loss" is incurred. In fact, the insured event formulated by the majority based upon that premise, i.e., the lender's acquisition of title to the mortgaged property, not only deviates from the annual statement method of accounting which is applicable to property and casualty insurance companies, but also deviates from the

"all events" test which is applicable to commercial enterprises on the accrual method of accounting. Finally, I am not willing to disregard the fact that "Default is the loss event recognized by the mortgage insurance industry, state regulatory requirements, * * * the Federal Home Loan Mortgage Corporation, and the Federal Housing Administration." Majority op. at 103, quoting from petitioner's opening brief.

The use of the annual statement method of accounting is mandatory for Federal income tax purposes. Section 832(b)(1)(A) directs that the gross income of property and casualty insurance companies, consisting of investment income and underwriting income, is to be "computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners." Unpaid losses, including both claims reported and unpaid and claims incurred but not reported (IBNR), form a part of "losses incurred," as defined by section 832(b)(5), and are taken into account in computing underwriting income which is defined by section 832(b)(3) to mean "the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred." Similarly, section 832(b)(6) defines the term "expenses incurred" for property and casualty insurance companies to mean "all expenses shown on the annual statement approved by the National Association of Insurance Commissioners."

The requirement that property and casualty insurance companies compute gross income and expenses in accordance with the annual statement is unqualified. It differs from the accounting rules prescribed for life insurance companies which specifically direct that computations shall be made principally "under an accrual method of accounting." Sec. 811(a). The annual statement method governs in the case of life insurance companies only "to the extent not inconsistent with" the accrual method of accounting used by the company "or any other provisions of this part" (i.e., part 1 of subchapter L of the Code). Sec. 811(a). The Code provisions dealing with property and casualty insurance companies, on the other hand, do not refer to the accrual

method of accounting or any method of accounting, other that the annual statement method.

The majority opinion quotes extensively from the Court's analysis in *Bituminous Casualty Corp. v. Commissioner*, 57 T.C. 58 (1971). Majority op. at 86-87. The issue in that case involved the Commissioner's attempt to "disallow" for income tax purposes certain reserves which had been reported on the basis required by the annual statement. In that case, the Court specifically considered the "controlling effect" of the annual statement for Federal income tax purposes and, after reviewing the cases which had addressed that issue, the Court concluded as follows:

> Two things are clear from these lines of cases. First, none of the cases stands for the proposition that general provisions appearing elsewhere in the Internal Revenue Code may be used to modify the annual statement method of computing underwriting income. On the contrary, the *New Hampshire Fire Insurance* [2 T.C. 708 (1943), affd. 146 F.2d 697 (1st Cir. 1945)] line of cases holds that Congress intended to follow the annual statement form precisely in respect of the items specified in section 832(b)(3) through (6), while the *General Reinsurance Corp.* [190 F.2d 148 (2d Cir. 1951)] line of cases holds that Congress intended that the annual statement be followed except to the extent inconsistent with the ordinary meaning of the language in section 832(b)(3) through (6). [*Bituminous Casualty Corp. v. Commissioner, supra* at 80-81.]

The Court found it unnecessary to choose between the two lines of cases described above because the result would be the same under either line: Either the reserves at issue were correct because the annual statement form must be followed precisely, or they were correct because they were not inconsistent with the ordinary meaning of the language in section 832(b)(3) through (6).

The same is true in this case. The majority opinion advances nothing to suggest that there is an inconsistency between the annual statement and the language in section 832(b)(3) through (6). Cf. *Western Casualty & Surety Co. v. Commissioner*, 65 T.C. 897 (1976), affd. 571 F.2d 514 (10th Cir. 1978). Therefore, I submit, the annual statement must be followed in this case and the majority errs in selecting a different timing rule under which mortgage guaranty insurance companies are required to take delinquent loans into account in estimating unpaid losses.

The majority does not address the controlling effect of the annual statement or discuss the two lines of cases analyzed by the Court in *Bituminous Casualty Corp. v. Commissioner, supra.* The majority justifies its disregard of the timing requirements under the annual statement on the ground that "State insurance regulators are concerned with the solvency of the insurer," whereas "Federal tax statutes are concerned with the determination of taxable income on an annual basis." Majority op. at 110. While I agree with that observation, I submit that it does not permit us to disregard the specific requirement of the Code that the underwriting income of property and casualty companies is to be "computed on the basis of" the annual statement. See sec. 832(b)(1)(A).

Moreover, the legislative history of the predecessor of section 832 shows that Congress was specifically advised that the annual statements submitted by property and casualty insurance companies are prepared to safeguard the interests of the public but it chose to rely on the annual statement for income tax purposes. The testimony of a representative of the Treasury Department, Dr. T.S. Adams, who was instrumental in formulating the present scheme for taxing property and casualty insurance companies when it was first adopted in 1921, includes the following:

> Dr. Adams. Let me take up fire and miscellaneous insurance companies.
>
>      *     *     *     *     *     *     *
>
> In the plan presented here the income and deductions are expressed in their own technical terms. All these insurance companies, as you know, have to make reports every year. *Those are uniform reports. They are carefully worked out, and the interests of the public are properly safeguarded.* In the proposed amendment the terms used in this report are employed. It starts out in this way: The ordinary insurance company has a possibility of making two kinds of profits: that is, it collects premiums from policyholders and on these it may make an underwriting income. Then they invest these funds, and have an investment income, and there is a possibility of a net income from that source. This plan starts out by saying that insurance companies shall be taxed upon their net underwriting income plus their net investment income, if any. Then the whole scheme of computing net income has, as is necessary in the case of insurance companies, to be on the accrued or incurred basis instead of on the actual cash basis. *That is the basis of this uniform*

*report, and it is adopted here.* [Testimony of Dr. T.S. Adams, Treasury Representative, Hearings before the Committee on Finance on H.R. 8245, U.S. Senate, 67th Cong., 1st Sess., 394 (1921); emphasis supplied.]

As mentioned above, I disagree with the premise underlying the majority opinion that the liability of an insurance company cannot become fixed for purpose of section 832(b)(5) prior to the occurrence of an event which makes it certain that a payment ultimately will be required. I submit that the majority confuses an insurance company's liability to make a payment when and if one becomes necessary with the payment itself. An insurance company's liability to pay must be fixed but the payment itself need not be. Otherwise, property and casualty insurance companies would not be entitled to treat, as "losses," cases in which the insurance company denies liability, Rev. Rul. 70-643, 1970-2 C.B. 141, and cases in which the obligation to make a payment is contingent, *Modern Home Life Ins. Co. v. Commissioner,* 54 T.C. 935 (1970). In all of those cases, there is no certainty that a payment will be required, until the contingency is removed or until the insurance company is found liable or ceases to contest liability. For purposes of both the annual statement and Federal income tax, a property and casualty insurance company is entitled to recognize the "loss" nevertheless.

*Modern Home Life Ins. Co. v. Commissioner, supra,* one of the cases cited by the majority, is contrary to the majority's premise that a "loss" cannot take place until an event which makes payment certain. That case involved an insurance company's deduction for losses incurred under a group disability insurance policy. The insurance company agreed, under the policy, to make mortgage payments on behalf of an insured mortgagor in the event that "injury or sickness wholly and continuously disabled an Insured Mortgagor" from making the payments. The Commissioner disallowed the deduction to the extent it included an estimate of future payments on behalf of claimants who were sick or disabled on the last day of the taxable year. The Commissioner argued that such amounts were not deductible because they were contingent upon future events and, in effect, were estimates of "future losses." *Modern Home Life Ins. Co. v. Commissioner, supra* at 938.

After noting that the terms "losses incurred" and "unpaid losses" are "predicated on insurance concepts" and that they must be construed to include "estimated liability for losses" which could not otherwise be deducted in the year in which the event occurs, the Court held as follows:

Thus, *if* we regard the initial sickness or illness or disability as the occurrence of the event insured against, the petitioner's liability to pay "something" became fixed on or before December 31 of the year in which the insured first became sick or disabled. The amount which the petitioner would be called upon to pay was dependent on the duration of that illness or disability but that condition went to a determination of the amount of the liability, if any, rather than to the fact of liability. [*Modern Home Life Ins. Co. v. Commissioner, supra* at 940; emphasis supplied.]

The Court rejected respondent's attempt to redefine the "insured event" to one which made payment certain, as would be required for an accrual method taxpayer.

In this case, the majority redefines the insured event prescribed under the annual statement method, a borrower's initial default, because of its view that the payment of a claim was not sufficiently fixed at that time. In choosing a different "insured event," the majority asserts that it does not mean to apply the "all events" test applicable to taxpayers on the accrual method of accounting. Majority op. at 112-113. The "all events" test requires the taxpayer's liability to be firmly established. During the years at issue in this case, it set forth a two-pronged test under which deductions were allowable for the taxable year in which all of the events have occurred which established the fact of the liability giving rise to such deduction and the amount thereof could be determined with reasonable accuracy. Sec. 1.446-1(c)(ii), Income Tax Regs. In 1984, Congress enacted section 461(h) and added to the "all events" test the requirement that "economic performance" must have occurred during the taxable year. Sec. 91(a), Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 598.

The majority opinion explains that its view differs from the "all events" test because "Even if the lender has acquired title, the amount of the loss will not necessarily be known" and it further notes that the insurance company would be entitled to deduct IBNR losses. Majority op. at

113. The majority opinion says that petitioner is, therefore, "not prohibited from using estimated amounts that would be improper under general accounting in computing its 'losses incurred.'" Majority op. at 113. I note that, under the "all events" test as applicable in this case, the company's liability would not become fixed until the lender files a claim with the company, rather than at the time the lender acquires title to the mortgaged property. See *United States v. General Dynamics Corp.*, 481 U.S. 239 (1987).

To summarize, following a borrower's initial default, a number of other events may take place, including notice of the default to the insurance company, initiation of foreclosure proceedings, the borrower's transfer of title to the mortgaged property to the lender, and the lender's submission of a claim to the insurance company. These "events" are reactions to, and take place as consequence of, the borrower's default. The majority rejects the insured event under the annual statement, a borrower's initial default, because the insurance company's liability for payment of the claim was not sufficiently certain at that time. On the other hand, it rejects the insured event under the "all events" test, the lender's submission of a claim, because the company's liability was too firmly established at that time, in view of the nature of a property and casualty insurance company which makes it inappropriate to apply general tax accounting principles.

I submit that, in rejecting both the annual statement method of accounting and the "all events" test, the majority has devised its own system. I also submit that the majority's view about what is necessary to fix an insurance company's liability and its definition of the insured event in conformity with that view is nothing more than selecting a different "link in the chain of events creating liability for purposes of" estimating losses incurred, pursuant to section 832(b)(5), to borrow a phrase from the Supreme Court's opinion in *United States v. General Dynamics Corp., supra* at 244.

Moreover, the majority's view is similar to an argument rejected by the Court in the *Bituminous Casualty Corp. v. Commissioner, supra* at 82. In that case the Commissioner argued that, for purposes of the issues in that case, the

word "liability" does not have the same meaning as when used in the "all events" test but refers to "an existing liability" in the sense that "all occurrences, i.e., injuries, accidents, or other covered events, have taken place, on the basis of which the retrospective premium will ultimately be determined." *Bituminous Casualty Corp. v. Commissioner, supra* at 82-83. The Court rejected the Commissioner's argument on the ground that there was no authority to justify giving the term a meaning different from that in the insurance industry. The same is true here.

The majority formulates its approach in this case on the basis of a "recurring theme" which it perceives to arise from three cases, *State of Maryland Deposit Ins. Fund Corp. v. Commissioner,* 88 T.C. 1050 (1987); *Maryland Savings-Share Ins. Corp. v. United States,* 226 Ct. Cl. 487, 644 F.2d 16 (1981); and *Modern Home Life Ins. Co. v. Commissioner,* 54 T.C. 935 (1970). Majority op. at 105-109. The majority acknowledges that all three cases are "distinguishable from each other and from the present case." Majority op. at 108.

I believe that each of the three cases was properly decided and I agree with the following "recurring theme" which the majority derives from those cases:

In *Modern Home Life Ins. Co.,* we allowed a deduction for the "unpaid losses" portion of "losses incurred" where the event insured against, the disability of the insured, had occurred prior to the end of the year, even though the amount of the loss was not fixed at that time. In both of the Maryland cases, the event insured against had not occurred and, in *State of Maryland Deposit Ins.,* we concluded that the insurance company taxpayer was not entitled to deduct a loss until the occurrence of the event that fixed the liability under the insurer's bylaws. In all three cases, however, the conclusion turned on whether or not the event insured against, under the terms of the polices or contracts at issue, had occurred. In both *Modern Home Life Ins. Co.* and *State of Maryland Deposit Ins.,* we concluded that an insurer is not entitled to a deduction for unpaid losses until the time that the insurer's liability was fixed under the relevant contractual terms. [Majority op. at 108-109.]

As the majority points out above, all three cases set forth the requirement that an insured event which fixes the liability of the insurance company must occur during the taxable period before an insurance company incurs a "loss." As discussed above, however, the majority opinion goes

beyond that requirement. It also holds, in effect, that the incurred event must make it certain that the insurance company will make a payment in each case. I submit that none of the three cases stands for that proposition. In fact, as discussed above, *Modern Home Life Ins. Co. v. Commissioner, supra,* stands for the opposite proposition. It holds that once an insured event takes place, a property and casualty insurance company can incur a loss for tax purposes, even though there is no certainty that a payment will be required.

None of the above three cases relied upon by the majority provides authority to disregard the annual statement method of accounting or to disregard the insured event taken into account under that method. Indeed, in *Modern Home Life Ins. Co. v. Commissioner, supra,* the Court rejected the Commissioner's attempt to apply "the strict terms of accrual" to the taxpayer and, in effect, to redefine the "insured event" from the initial sickness or illness of the insured mortgagor to a later event, compatible with the "all events" test, which would firmly establish the taxpayer's obligation to make the mortgage payments in the future based upon the insured mortgagor's continued sickness or disability.

The Maryland cases both involve the Maryland Deposit Insurance Fund Corporation (MDIFC), a State chartered corporation, formed to guarantee the accounts of depositors in savings and loan associations which were not Federally insured. The MDIFC was not a traditional insurance company. It reported income and expenses on the cash receipts and disbursements method of accounting until 1971 when it received permission to change to the accrual method. *Maryland Savings-Share Ins. Corp. v. United States, supra* at 18. Its Federal income tax returns for 1974 through 1982, the years at issue in the second Maryland case, were filed on the accrual method of accounting. *State of Maryland Deposit Ins. Fund Corp. v. Commissioner, supra* at 1056. There is no suggestion in either opinion that MDIFC conformed itself to State insurance regulations or filed annual statements.

In each of the two Maryland cases, the taxpayer attempted to redefine the "insured event" from the event

established under MDIFC's bylaws, i.e. the bankruptcy of a member institution or the appointment of a conservator or receiver for such institution. The taxpayer sought to include as loss events certain acts which were not covered under the bylaws, consisting of a "course of conduct that typically precedes a failure," including acts of mismanagement, issuance of bad loans, and embezzlement. In the Maryland cases, the Courts refused to permit the taxpayer to redefine the event of default, and they applied the general rule that an insurance company does not incur a loss until an insured event takes place.

Unlike the Maryland cases, the "insured event" under the annual statement in this case, a borrower's default, is an integral part of the insurance coverage under the subject mortgage guaranty insurance policies. It is evident from the facts found by the majority that every loss covered under the subject policies started with and was attributable to a "default by a borrower." The majority found that, under the policies, "the insured lender was required to notify the insurer when a borrower under an insured mortgage loan was 'in default,' i.e., the borrower failed to make a required payment of principal and interest on a timely basis." Majority op. at 75. The length of default was not a condition to recovery under the policies but clearly a default was.

Admittedly, the occurrence of a default did not ultimately lead to a payment by the insurance company in every case. The fact of the matter is that a borrower could cure a default at any time and stop the foreclosure process. It is also possible, although it probably did not happen as often, that the value of the real estate held as collateral turned out to be sufficiently high to offset the balance of the mortgage and the lender's costs, so that no additional payment from the insurance company was required.

It is clear, however, that the PMI companies treated themselves as liable once the initial default occurred during the policy period, even though later events leading up to payment of the loss, such as notice of default, foreclosure, acquisition of title and claim by the insured, all took place after the policy was canceled or expired. The majority found the following:

As interpreted by the PMI companies, the policies generally in effect during the years in issue provided coverage for losses resulting from delinquencies within the policy period. A claim would be allowed as long as the policy was in effect during the period in which the initial delinquency occurred. The policy did not have to be in effect at the time the NOD was received, foreclosure proceedings were instituted, or title was transferred from the borrower.

A lender could cancel a policy during a delinquency period and receive a premium refund and still be entitled to file a claim for loss as long as the initial delinquency occurred within the policy period. If the delinquency was cured, there was no coverage for any subsequent delinquencies that occurred after the cancellation. It was not uncommon for lenders to allow policies to lapse.

[Majority op. at 78.]

Moreover, a borrower's initial default is treated as the insured event not only by the PMI companies and the State insurance regulators, but also by the Federal Home Loan Mortgage Corporation which imposes reserve requirements, similar to those under the annual statement, on eligible insurers, majority op. at 79, and by the Federal Housing Administration, which adopted accounting practices and reporting policies similar to those followed by private mortgage guaranty insurers under the annual statement. Majority op. at 80.

The fact that every default did not result in the payment of a claim does not mean that no default did. Indeed, as the majority notes, for many lines of insurance, the percentage of insured events which does not result in ultimate loss payment can run from 5 percent to 90 percent, depending on the nature of the coverage. Majority op. at 112. I see no more justification for redefining the insured event in connection with those lines of insurance than I do in the case of mortgage guaranty insurance.

In computing their unpaid losses, the mortgage guaranty insurance companies in this case started with all cases in which a borrower had defaulted during the year and, based upon their experience with such cases, they determined which cases would ultimately require a payment and which of them would be cured or, ultimately, would require no payment. The process followed by the PMI companies, as described by the majority, including the use of a so-called "loss frequency factor" and "loss severity rate," in my view, follows estimating techniques which are common in

the insurance industry. See majority op. at 81-83, 111. The companies' estimates are based upon actual loss events, i.e., defaults, which occurred during the year and which are covered under a policy in force. They are not merely predictions of losses which may take place in the future. After a borrower's initial default, the PMI companies are liable to make whatever loss payments are eventually required. *Modern Home Life Ins. Co. v. Commissioner, supra.*

The estimates made by the PMI companies are not insulated from review and adjustment by the Commissioner merely because they are set forth on the annual statement. In the words of the regulations, the insurance company "must be prepared to establish to the satisfaction of the district director that the part of the deduction for * * * unpaid losses * * * based upon the facts in each case and the company's experience with similar cases, * * * represent a fair and reasonable estimate of the amount the company will be required to pay." Sec. 1.832-4(b), Income Tax Regs. The adjustments approved by the majority in this case, however, go far beyond the adjustments contemplated by the regulations. They represent a complete revision of the accounting and reporting method required under the annual statement for Federal income tax purposes and, in my view, are contrary to requirement contained in section 832(b)(1)(A) that underwriting income is to be "computed on the basis of" the annual statement.

I find it impossible to reconcile the majority's view about what is necessary to fix the liability of an insurance company with its recognition of the fundamental difference between property and casualty insurance companies, which use the annual statement method of accounting, and other commercial entities and its further recognition of the inappropriateness of applying general tax accounting principles to property and casualty insurance companies. See majority op. at 112-113.

*Payments to Insurance Company Subsidiary*

The opinions released today in the *Sears, AMERCO,* and *Harper* cases constitute another installment in the continuing saga over the treatment of payments to so-called

"captive" insurance companies. When we last addressed this issue in *Gulf Oil Corp. v. Commissioner,* 89 T.C. 1010, 1023 (1987), affd. on this issue 914 F.2d 396 (3d Cir. 1990), the Court was faced for the first time "with a wholly owned captive that insure[d] unrelated third-party risks as well as those of its affiliated group." In each of the Court's three prior opinions on this issue, *Carnation Co. v. Commissioner,* 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981), cert. denied 454 U.S. 965 (1981); *Clougherty Packing Co. v. Commissioner,* 84 T.C. 948 (1985), affd. 811 F.2d 1297 (9th Cir. 1987); and *Humana, Inc. v. Commissioner,* 88 T.C. 197 (1987), affd. in part and revd. in part 881 F.2d 247 (6th Cir. 1989), the facts were "identical" to those in *Gulf,* except "the captive insured risks only within the affiliated group." *Gulf Oil Corp. v. Commissioner, supra* at 1023.

In *Gulf,* the majority of the Court opined that the addition to the captive's premium pool of "a sufficient proportion of premiums paid by unrelated parties" should allow the premiums paid by the affiliated group to be deductible as insurance premiums, rather than to be treated as payments to a reserve from which to pay losses. To be sufficient, the premiums from unrelated parties had to be high enough to cause "the aggregate premiums paid by the captive's affiliated group [to be] insufficient in a substantial amount to pay the aggregate anticipated losses of the entire group, the affiliates and unrelated entities." *Gulf Oil Corp. v. Commissioner, supra* at 1027. In that situation, the Court said, "Risk distribution and risk transfer would be present, and the arrangement [would] no longer in substance [be] equated with self-insurance." *Gulf Oil Corp. v. Commissioner, supra* at 1027.

In *Gulf Oil Corp.,* the captive's net premium income from the insurance of third-party risks was only 2 percent of the captive's total net premium income, an amount insufficient to satisfy the Court that "risk transfer had occurred." 89 T.C. at 1027. Accordingly, the Court held that its prior decisions, *Carnation Co. v. Commissioner, supra, Clougherty Packing Co. v. Commissioner, supra,* and *Humana, Inc. v. Commissioner, supra,* were applicable and that the amounts paid by Gulf and its affiliates to the captive were not

deductible as insurance premiums. *Gulf Oil Corp. v. Commissioner, supra* at 1027.

The facts in the *Sears, AMERCO,* and *Harper* cases are similar to those in *Gulf,* except that the percentage of each captive's premium income derived from the insurance of outside risks exceeds the level found to be de minimus in the *Gulf* case. In *Sears,* the majority found that "the total premiums for Allstate's policies with unrelated policyholders represented approximately 99.75 percent of Allstate's total premiums earned during the years in issue." Majority op. at 64. In *AMERCO & Subsidiaries,* the majority found that "outside insurance constituted over 50 percent of Republic Western's gross written premiums for each of the years at issue." *Amerco v. Commissioner,* 96 T.C. 18, 36-37 (1991). (Fn. ref. omitted.] Lastly, in *Harper,* the majority found that "the unrelated insureds comprise approximately 30 percent of Rampart's business." *Harper Group & Subsidiaries v. Commissioner,* 96 T.C. 45, 60 (1991). In light of the discussion by the majority in *Gulf* about the effect of insuring unrelated risks, the result reached by the Court in the *Sears, AMERCO,* and *Harper* cases is not surprising.

The majority in each case outlines a "framework" for addressing questions of the existence of insurance for Federal tax purposes which is comprised of the following three principles: First, the transaction must involve an actual insurance risk; second, it must involve both risk shifting and risk distribution; and, third, it must involve commonly accepted notions of insurance. Majority op. at 100-101; *AMERCO & Subsidiaries v. Commissioner, supra* at 38-42; *Harper Group v. Commissioner, supra* at 57. In each of the subject cases, the majority lists risk shifting as one of the principles to take into account in determining whether "insurance" exists. However, I submit that the effect of the opinions in the subject cases is to completely dispense with the test of risk shifting, if premiums earned by the captive from unrelated insureds amount to 30 percent of the total premiums during the year, see *Harper Group & Subsidiaries v. Commissioner, supra* at 58-60, or qualify as "substantial," an "opaque" term which the majority does not define, see *AMERCO & Subsidiaries v. Commissioner, supra* at 37.

The majority concludes that there was "technical risk shifting" by briefly recounting the fact that the subject transactions followed the form of "insurance" contracts under which premiums were transferred, and losses paid and the fact that the captive was "a separate, viable entity, financially capable of meeting its obligations." Majority op. at 100; *AMERCO & Subsidiaries v. Commissioner, supra* at 40; see *Harper Group & Subsidiaries v. Commissioner, supra* at 60. The majority finds that "risk shifting was also present in substance" but its explanation of the basis for the finding differs in each opinion. In *Sears,* the majority explains that the captive, Allstate, was neither formed nor operated for the purpose of providing "self-insurance" to Sears but sold policies to Sears on the same basis as it sold policies to unrelated third parties. Majority op. at 100. In *AMERCO,* the majority's explanation goes beyond the fact that the captive was not the equivalent of a reserve for losses of its parent and includes the fact that the captive "wrote substantial other business during each of the years at issue, see *Gulf Oil Corp. v. Commissioner, supra* at 1027." *AMERCO & Subsidiaries v. Commissioner, supra* at 41. Thus, in *AMERCO,* the majority makes specific reference to the theory advanced by the majority in *Gulf* that the addition of unrelated insurance premiums into the insurance pool establishes risk transfer. Lastly, in *Harper Group & Subsidiaries,* the majority notes that the captive was not a sham but conducted a bona fide business and was regulated as an insurance company under the laws of Hong Kong and that the premiums paid by its affiliates were negotiated at arm's length. *Harper Group & Subsidiaries v. Commissioner, supra* at 59. In *Harper & Subsidiaries v. Commissioner, supra,* the majority also states as follows (at 59):

In our opinion, in the captive insurance company arena, given a sufficient number of unrelated insureds, risk can be transferred from an owner-insured to the captive insurer.

Again, the majority makes reference to the theory advanced in *Gulf* that sufficient distribution of risk among unrelated insureds, by itself, establishes risk transfer.

While *AMERCO* and *Harper* make reference to the theory advanced in *Gulf,* none of the three opinions analyzes whether the premiums paid by unrelated insureds are

sufficient to pay "the aggregate anticipated losses of the entire group, the affiliates and unrelated entities," as would be required under the opinion of the majority in *Gulf. Gulf Oil Corp. v. Commissioner, supra* at 1027. Evidently, the majority's view in the instant case as to what amount of premiums from unrelated insureds is sufficient to bring about risk shifting differs from the majority's view in *Gulf.* Under the subject opinions, the amount of unrelated insurance need only be "substantial." *AMERCO & Subsidiaries v. Commissioner, supra* at 41.

In any event, for the reasons set forth in Judge Goffe's concurring opinion in the *Gulf* case, I disagree with the view that unrelated insurance establishes risk shifting. See *Gulf Oil Corp. v. Commissioner, supra* at 1032. It is not necessary to repeat Judge Goffe's analysis here. Suffice it to say that, in my view, risk shifting and risk distribution are separate elements of "insurance" and both must be found. E.g., *Helvering v. Le Gierse,* 312 U.S. 531 (1941). "An arrangement without the elements of risk-shifting and risk-distributing lacks the fundamentals inherent in a true contract of insurance." *Beech Aircraft Corp. v. United States,* 797 F.2d 920, 922 (10th Cir. 1986). Moreover, the majority opinion in *Sears* notes that the experts who testified on both sides in that case "specifically addressed the theory of the majority in *Gulf,* but none of the experts fully adopted or supported that theory." Majority op. at 99.

I also submit that the other facts identified by the majority as a basis for finding risk shifting are inappropriate for that purpose. For example, the majority concludes that the captive is not "operated for the purpose of providing 'self-insurance' " to its parent corporation, majority op. at 100, or is "not the equivalent of a reserve for losses" of the parent, *AMERCO & Subsidiaries v. Commissioner, supra* at 41. This finding goes to the ultimate issue in the case, whether the payments are for "insurance" or are contributions to a reserve for losses, and makes it unnecessary to determine whether there is risk shifting. It is only necessary to determine whether there is risk shifting in order to answer the ultimate issue, not vice versa. See *Clougherty Packing Co. v. Commissioner,* 811 F.2d 1297 (9th Cir. 1987), affg. 84 T.C. 948 (1985). Similarly, the fact

that the subject transactions are cast in the form of "insurance" transactions, is not determinative. The economic reality of the transactions, rather than their form, determine their tax consequences. *Gregory v. Helvering,* 293 U.S. 465 (1935).

Moreover, the fact that the captive is a separate entity and is financially capable of meeting its obligations does not determine whether risk shifting is present in a particular transaction. That depends upon whether the transaction has the effect of insulating the "insured" from the economic consequences of an insurance risk, it does not depend upon the captive's financial capability. I agree with the Ninth Circuit's formulation of what is required for risk shifting to exist in an insurance transaction:

we examine the economic consequences of the captive insurance arrangement to the "insured" party to see if that party has, in fact, shifted the risk. In doing so, we look only to the insured's assets * * * to determine whether it has divested itself of the adverse economic consequences of a * * * claim. [*Clougherty Packing Co. v. Commissioner,* 811 F.2d at 1305.]

The majority notes that *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943), requires the Court to respect the separateness of the two entities, absent some reason for disregarding that separateness, and finds no such reason is present in this case. Majority op. at 101. I agree. It does not follow, however, that there is risk shifting in these cases just because each of the captives is a separate corporation from its parent and other affiliated corporations, nor does it follow that we can not or should not take the economic relationship of the companies into account in evaluating whether risk shifting took place. Similarly, we can find that risk shifting did not take place, without disregarding the separate legal status of the entities. *Clougherty Packing Co. v. Commissioner,* 811 F.2d at 1305; *Beech Aircraft Corp. v. United States, supra.*

Finally, the fact that the captive sells policies to unrelated insureds and the fact that affiliated corporations purchase policies from the captive on the same general terms as unrelated third parties, are facts which go to the question whether there has been risk distribution, not risk shifting.

For the foregoing reasons, I respectfully dissent.